In re ACUSHNET RIVER & NEW BED-
FORD HARBOR: PROCEEDINGS Re
ALLEGED PCB POLLUTION.

Civ. A. No. 83–3882–Y.

United States District Court,
D. Massachusetts.

Oct. 27, 1989.

See also 722 F.Supp. 893.

MEMORANDUM AND ORDER ON
INSURANCE ISSUES

YOUNG, District Judge.

On December 10, 1983, the United States and the Commonwealth of Massachusetts (the "sovereigns") brought an action against several corporations including Belleville Industries, Inc. ("Belleville") and Aerovox Incorporated ("Aerovox"), a wholly owned subsidiary of RTE Corporation, alleging that the defendants are liable for damages under federal and state law for the polychlorinated biphenyl pollution of the New Bedford Harbor (the "pollution" or "underlying" litigation).[1] From January 1, 1973 through October 27, 1978, Belleville owned and operated a manufacturing plant (the "facility") which is bounded on the easterly side by the Acushnet River, an estuary leading directly into the New Bedford Harbor. Aerovox purchased the facili-

1. For a discussion of the pretrial issues raised in the underlying litigation, *see In re Acushnet River & New Bedford Harbor Proceedings Re Alleged PCB Pollution,* 675 F.Supp. 22 (D.Mass.1987) (*"Acushnet I"*) (jurisdiction and parties); 712 F.Supp. 994 (D.Mass.1989) (*"Acushnet II"*) (the right to jury trial); 712 F.Supp. 1010 (D.Mass. 1989) (*"Acushnet III"*) (successor liability); 712 F.Supp. 1019 (D.Mass.1989) (*"Acushnet IV"*) (partial settlements); 716 F.Supp. 676 (D.Mass. 1989) (*"Acushnet V"*) (natural resource damages under CERCLA); 722 F.Supp. 888 (D.Mass. 1989) (*"Acushnet VI"*) (scope and standard of judicial review); and 722 F.Supp. 893 (D.Mass. 1989) (*"Acushnet VII"*) (federally permitted releases).

ty from Belleville on October 27, 1978. The facility was used by both Belleville and Aerovox to manufacture electrical capacitators. During the period of Belleville's ownership, such capacitators were impregnated or filled with polychlorinated biphenyls ("PCBs").

Lumbermens Mutual Casualty Company ("Lumbermens") and Fireman's Fund Insurance Company ("Fireman's Fund") brought this action to obtain a declaration of their obligations under insurance contracts they issued to Belleville and Aerovox respectively. Before the Court are several motions for summary judgment brought by the insurers.

## I. GENERAL CONSIDERATIONS

Each of the several motions raises a separate aspect of the contractual relationship between the parties as an independent ground for summary judgment. Given the complexity of this case, it is appropriate first to set forth the analytic framework employed by the Court to address each of these motions. At the most general level, the parties are on common ground. Everyone agrees that the insurance contracts at issue are to be substantively interpreted according to state law, specifically the law of the Commonwealth of Massachusetts. Likewise, everyone agrees that federal law determines whether the insurers are entitled to summary judgment under Fed.R. Civ.P. 56.[2]

Rule 56(c) provides that summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." The Supreme Court in *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) held that summary judgment ought be entered against a party when, after adequate time for discovery, that party has failed "to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial." A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *See* Fed.R.Civ.P. 56(c).

Only genuine issues of material fact will prevent the entry of summary judgment and the issue of materiality is governed by the substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgement." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Further, such disputes must be "genuine." The Supreme Court has held that a dispute regarding a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511. "In essence, . . . the inquiry under [the summary judgment standard and the directed verdict standard] is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2511–12.

If the movant makes out a *prima facie* case that, if uncontroverted, would entitle it to a directed verdict at trial, summary judgment will be granted unless the party opposing the motion offers some competent evidence that could be presented at trial showing that a genuine issue as to a material fact exists. In this way, the burden of

---

**2.** As will become apparent, however, the litigants abruptly part company over exactly where

to draw the substance-procedure boundary. *See infra* Section II at 1269 n. 9.

producing evidence is shifted to the party opposing the motion. C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure,* sec. 2727, at 143 (2d ed. 1983). "The burden on the nonmoving party is not a heavy one; [she] simply is required to show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial." *Id.* at 148 (footnote omitted).

Intertwined with the summary judgement standard is the law of Massachusetts as stated in *Sterilite Corp. v. Continental Casualty Co.,* 17 Mass.App.Ct. 316, 458 N.E.2d 338 (1983) (Kaplan, J.), *rev. denied,* 391 Mass. 1102, 459 N.E.2d 826 (1984) (*"Sterilite"*). *Sterilite* provides the most thorough and current analysis of the issues posed by these motions for summary judgment, namely whether the insurers have a duty to defend and indemnify the insureds in the pollution case. *See also Travelers Inc. Co. v. Waltham Industrial Laboratories Corp.,* 883 F.2d 1092 (1st Cir.1989) (discussing certain of these issues under Massachusetts law and citing *Sterilite* favorably) (*"Travelers"*).[3]

Under *Sterilite,* the insurers are obligated to defend their insureds if there is "a possibility that the liability claim falls within the insurance coverage." *Id.* 17 Mass. App.Ct. at 319, 458 N.E.2d 338 (quoting *Union Mutual Fire Ins. Co. v. Inhabitants of the Town of Topsham,* 441 A.2d 1012, 1015 [Me.1982]). The allegations in the complaint need only be " 'reasonably susceptible' of an interpretation that they state or adumbrate a claim covered by the policy terms" to implicate the defense coverage. *Continental Casualty Co. v. Gilbane Bldg. Co.,* 391 Mass 143, 146, 461 N.E.2d 209 (1984). *See also Travelers,* at 1095 (and cases cited). To call upon the insurers to defend, the Court need not find that the injury complained of in the underlying litigation unquestionably comes within the policy terms; rather, regardless of

the ultimate success of the underlying litigation or the viability of the theory of liability advanced therein, the insurers must defend if the injury of which the plaintiffs in the underlying action complain could reasonably be said to come within the terms of the insurance. *See Gilbane,* 391 Mass. at 146, 461 N.E.2d 209; *Sterilite,* 17 Mass.App.Ct. at 319–320, 458 N.E.2d 338 ("In order for the duty of defense to arise, the underlying complaint need only show, through general allegations, a possibility that the liability claim falls within the insurance coverage. There is no requirement that facts alleged in the complaint specifically and unequivocally make out a claim with coverage."), quoting *Union Mutual Fire Ins. Co.,* 441 A.2d 1015; *Wolov v. Michaud Bus Lines, Inc.,* 21 Mass.App.Ct. 60, 63, 484 N.E.2d 644 (1985).

What can an insurer do to bring the duty to defend to an end once that duty is imposed? In *Sterilite,* the court held that the insurer "can, by certain steps, get clear of the duty from and after the time when it demonstrates *with conclusive effect on the third party* that as matter of fact—as distinguished from the appearances of the complaint and policy—the third party cannot establish a claim within the insurance." 17 Mass.App.Ct. at 323, 458 N.E.2d 338 (emphasis added).

## II. POLLUTION EXCLUSION

The first of the motions for summary judgment deals with the contention by Lumbermens and Fireman's Fund that they do not have an obligation either to defend or to indemnify the insureds in the underlying litigation in light of the pollution exclusion clauses contained in the insurance contracts.[4]

Lumbermens issued Belleville general liability insurance policies which covered the period from January 2, 1973 to January 1,

---

**3.** The Federal Reporter citation for *Travelers* is 883 F.2d 1092 (1989). The Court will cite to the slip opinion in discussing *Travelers,* however, because the publication page reference numbers were not available when this opinion was published.

**4.** The original motion by Fireman's Fund raising this point was denied by the Court from the bench on September 5, 1986, the Court reserving its right to explicate its thinking in a written opinion. This opinion deals afresh with the issues raised both by Lumbermens and Fireman's Fund.

1977 and excess liability insurance policies covering the period from December 26, 1972 to January 2, 1976. Fireman's Fund issued RTE Corporation comprehensive general liability insurance policies, naming Aerovox as an insured, which covered the period from March 1, 1981 to March 1, 1986, and excess liability insurance policies covering the period from March 1, 1981 to March 1, 1983. Under these policies, Lumbermens and Fireman's Fund are obligated to pay:

> all sums which the insured shall become legally obligated to pay as damages because of (a) bodily injury or (b) property damage to which this insurance applies, caused by an occurrence, and the [insurer] shall have the right and duty to defend any suit against the insured seeking damages, on account of such bodily injury or property damage, even if any of the allegations of the suit are false or fraudulent. . . .

The policies also contain an exclusion from coverage for damage relating to the release of pollutants into the environment. This so-called "pollution exclusion" provides that the insurance policy does not apply:

> to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

5. For purposes of the pollution exclusion motion for summary judgement, the parties have assumed that an "occurrence" took place under the policy. Such assumption is only for purposes of this motion and all parties have reserved their rights as to this issue.

6. The Court's ruling that the contract language is unambiguous obviates the need to inquire into the nuances of its drafting and moots Aerovox's motion (AX–14) seeking to invoke the doctrine of judicial estoppel. That motion is thus denied.

7. In *Shapiro v. Public Service Mutual Ins. Co.*, 19 Mass.App.Ct. 648, 477 N.E.2d 146 (1985), *rev. denied*, 395 Mass. 1102, 480 N.E.2d 24 (1985)

Lumbermens and Fireman's Fund move for summary judgment on the ground that they have no obligation under the insurance contracts to defend or indemnify the insureds because the discharge, dispersal, release or escape of PCBs from the facility during the insured period was not sudden and accidental.[5]

Although the terms "sudden and accidental" are not defined in the policy, the Court rules that, as matter of law, they are unambiguous.[6] As in any contract action, "whether a contract is clear or ambiguous is a question of law." *In re Navigation Technology Corp.*, 880 F.2d 1491, 1495 (1st Cir.1989) (citing *Boston Edison Co. v. F.E. R.C.*, 856 F.2d 361, 365 [1st Cir.1988] [construing Massachusetts law]); *Zanditon v. Feinstein*, 849 F.2d 692, 696 (1st Cir.1988); *Triple–A Baseball Club Assocs. v. Northeastern Baseball, Inc.*, 832 F.2d 214, 220 (1st Cir.1987), *cert. denied*, 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988) (construing Maine law). In *New England Gas and Elec. Ass'n v. Ocean Accident and Guarantee Corp.*, 330 Mass. 640, 116 N.E.2d 671 (1953), the Supreme Judicial Court defined "sudden" in the context of the insurance policy at issue in that case as "a happening without previous notice or with very brief notice, or as something coming or occurring unexpectedly, unforeseen or unprepared for. . . . The damage . . . could not be reasonably anticipated, and its occurrence was unexpected and unforeseen and consequently sudden in the ordinary sense of the word." *Id.* at 654, 116 N.E.2d 671.[7] *See also The American Heritage Dictionary* 1215 (2d College ed. 1985), which defines the word "sudden" as

(table), *rev. denied*, 395 Mass. 1105, 482 N.E.2d 328 (1985) (table), the Appeals Court concluded generally that "when used in the context of pollution, the words 'sudden and accidental' are to be given the same meaning as is ordinary in the area of business liability insurance. . . ." *Id.* 19 Mass.App.Ct. at 651–52, 477 N.E.2d 146. While the Appeals Court followed "the well established Massachusetts concept of 'accident,'" *id.* at 652, 477 N.E.2d 146, the term "sudden" appears to have given it some pause. Citing *New England Gas and Elec. Ass'n v. Ocean Accident and Guarantee Corp.*, 330 Mass. 640, 116 N.E.2d 671 (1953), the court concluded that a "sudden" event did not necessarily connote a "dramatic catastrophe" nor need it be limited to

follows: "1. Happening without warning; unforeseen.... 2. Characterized by hastiness; abrupt; rash.... 3. Characterized by rapidity; quick; swift...." Similarly, in Massachusetts "the well-defined concept of 'accident' is 'an unexpected happening without intention or design.'" *Shapiro v. Public Service Mutual Ins. Co.*, 19 Mass. App.Ct. 648, 652, 477 N.E.2d 146, *rev. denied*, 395 Mass. 1102, 480 N.E.2d 24 (1985) (table), *rev. denied*, 395 Mass. 1105, 482 N.E.2d 328 (1985) (table) (quoting from *Quincy Mutual Fire Ins. Co. v. Abernathy*, 393 Mass. 81, 83, 469 N.E.2d 797 [1984] and *Beacon Textiles Corp. v. Employers Mutual Liability Ins. Co.*, 355 Mass. 643, 645, 246 N.E.2d 671 [1969]). The Court thus concludes that, in using the words "sudden and accidental" in the insurance contracts between them, the minds of the parties met and they adopted the commonly understood definitions expressed above.[8]

Concluding that the phrase "sudden and accidental" is unambiguous does not, how-

---

an "instantaneous happening." Having so ruled, the Appeals Court construed the insurance contract against the insurer and held that the escape of oil from an underground tank into the ground water and thence into a culvert was "sudden and accidental," notwithstanding the insurers apparently uncontroverted arguments that the corrosion of the tank was a progressive condition and the resulting pollution occurred over an indeterminate period of time. 19 Mass. App.Ct. at 652, 477 N.E.2d 146. After *Shapiro*, the word "sudden," when used in the context of a pollution exclusion clause, certainly encompasses events transpiring over some period of time, *i.e.*, noninstantaneous events.

Although the *Shapiro* court stated that the insurance policy in question was not "free from ambiguity," *Id.* at 651, 477 N.E.2d 146, this Court sees no inconsistency in its holding that, for the purposes of the insurers' motions in this case, the phrase "sudden and accidental" is unambiguous. In *Shapiro*, the Appeals Court construed the insurance contract against the insurer and expanded the definition of "sudden" beyond that set out by the Supreme Judicial Court in *New England Gas*. Because the Court has confined its analysis to whether any of the insureds alleged releases were "sudden and accidental" as that phrase is defined in *New England Gas*, it relies on neither the *Shapiro* court's assessment as to the clarity of "sudden and accidental" nor that court's expanded definition of "sudden." Even assuming *arguendo* that the phrase "sudden and accidental" is somewhat ambiguous, the Court cannot imagine that it would receive from the Supreme Judicial Court a narrower definition than it did in *New England Gas*. Therefore, the Court concludes that, for the purposes of this motion, the use of the definitions set forth in *New England Gas* will not prejudice the insurers. Moreover, because the Court in this opinion denies each of the insurers' motions for summary judgment, the insureds likewise will not suffer any prejudice. The Court also notes that it intends to certify questions to the Supreme Judicial Court concerning the definition of "sudden" in the pollution exclusion clauses at issue here, and to rely on the Supreme Judicial Court's analysis at trial.

8. The insurers have urged the Court to conclude that the word "sudden" does not add any new meaning to the word "accidental." Both *New England Gas*, 330 Mass. at 652–54, 116 N.E.2d 671 and *Shapiro* 19 Mass.App.Ct. at 652, 477 N.E.2d 146 define the words "sudden" and "accident" separately, however, thus implying that their meanings are distinct. *See Abernathy*, 393 Mass. 81, 84, 469 N.E.2d 797 (1984) ("It is arguable that the insurer intended a different meaning to attach to the word 'expected' by virtue of the disjunctive used in the exclusion clause, denying coverage for injuries 'either expected *or* intended.'"). Common sense and usage dictate that while the word "sudden" means unexpected or unanticipated it also has a temporal quality. The Court disagrees with the insurers' position and rules that in Massachusetts the two words have distinct meanings. More specifically, the word "sudden," as used in its ordinary sense, has a temporal meaning. *See C.L. Hauthaway & Sons Corp. v. American Motorists Ins. Co.*, 712 F.Supp. 265 (D.Mass.1989) (and cases cited).

Further, the Court rejects the insurers' argument that the pollution exclusion is a mere restatement of the word "occurrence" as that term is used in the policy. Occurrence under the policy is defined as "an accident, including continuous or repeated exposure to conditions, which results in ... property damages neither expected nor intended from the standpoint of the insured." There is an occurrence under the policy if the damage was not intended but was caused by an intentional act. *Waste Management of Carolinas Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 340 S.E.2d 374, 379 (1986) ("Even intentional acts, the consequences of which are unexpected, have been held to qualify as 'occurrences.'"); *Transamerica Ins. Co. v. Sunnes*, 77 Or.App. 136, 711 P.2d 212, 214 (1985) ("The fact that the *damage* was not intended means that there was an 'occurrence' within the policy definition."), *rev. denied*, 301 Or. 76, 717 P.2d 631 (1986) (table). *See also Abernathy*, 393 Mass. at 84, 469 N.E.2d 797 ("[T]he resulting injury which ensues from the volitional act of the insured is still an 'accident' within the meaning of an insurance policy if the insured does not specifically intend to cause the resulting harm or is not substantially certain that such harm

ever, bring the analysis to an end. In order to determine whether the sovereigns' claims possibly come within the terms of the policy, the Court must interpret and declare the reach of the pollution exclusion, focusing specifically on the meaning of the words "sudden and accidental" within the particular context of that exclusion. As in any insurance contract action where the duty to defend is questioned, the inquiry initially focuses on the allegations in the complaint. *Travelers*, at 1095. The United States alleges in its complaint that the insureds have:

> thrown, discharged, deposited or caused, suffered, or procured to be thrown, discharged or deposited from their manufacturing establishments refuse contaminated with PCBs, and other refuse matter, into the Estuary and New Bedford Harbor, and the tributaries of such waters, without permits issued by the Secretary of the Army.

United States' First Amended Complaint, para. 78, at 19. The Commonwealth of Massachusetts has made similar allegations. Commonwealth's First Amended Complaint, paras. 34–43, at 10–13.

The sovereigns' allegations that PCBs have caused and continue to cause property

damage, United States' First Amended Complaint, para. 37, at 10, are " 'reasonably susceptible' of an interpretation that they state or adumbrate a claim covered by the policy terms...." *Sterilite*, 17 Mass. App.Ct. at 318, 458 N.E.2d 338. Nothing in the complaint alleges that all the releases were both non-sudden and non-accidental. Therefore, the insurers must undertake the defense of the insured unless they can conclusively prove that every single release was non-sudden and non-accidental. Under *Sterilite*, if there is even one release that was sudden and accidental then the motions for summary judgment must be denied and each insurer must defend its insured. Granted, this burden is formidable. The Massachusetts courts have not made it easy for an insurer to obviate the basic duty to defend set out in insurance contracts. This burden seems appropriate, however, given the language of the insurance policy and the risk and cost assessments between insurer and insured.

While Fed.R.Civ.P. 56 sets out the procedural rules to be followed in determining whether or not to grant summary judgment to the insurers, *Sterilite* sets out the substantive rules.[9] Under Rule 56, the in-

---

will occur"). The pollution exclusion focuses on the discharge, not the resulting property damage. It excludes coverage for occurrences caused by the "discharge, dispersal, release or escape" of pollutants unless the "discharge, dispersal, release or escape [was] sudden and accidental." Thus, in the context of pollution or contamination, an insured can point to non-expected or non-intended property damage, and therefore can have an occurrence under the policy and yet still be excluded from coverage on the ground the initial release or discharge was expected, intended, or non-sudden. In order to obtain coverage under the policies in question, both the property damage *and* the initial release or discharge must be unexpected or unintended and, further, the initial release must be sudden.

9. The insurers take issue with this conclusion. *See* Lumbermens Mutual Casualty Company's Memorandum of Law in Support of Its Motion to Certify the Court's *"Sterilite"* Ruling for Interlocutory Appeal (Docket # 1383) at 11–17; Memorandum of Aetna Casualty and Surety Company in Support of the Motion of Lumbermens Mutual Casualty Company to Certify the Court's *"Sterilite"* Ruling for Interlocutory Appeal

(Docket # 1397) at 3. They argue that, having sought the federal declaratory judgment remedy established by 28 U.S.C. sec. 2201 and invoked the federal procedural summary judgment mechanism, Fed.R.Civ.P. 56(c), they are entitled to judgment at this point in the proceedings. "The judgment sought shall be rendered forthwith," they point out, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as ... matter of law." *Ibid.*

While the insurers are correct that, as between their insureds and themselves, review of the materials enumerated in the Rule reveals virtually "no genuine issue of material fact," their argument is nevertheless fatally flawed. The Declaratory Judgments Act does not expand the scope of the subject matter jurisdiction of the federal courts; it merely makes the declaratory remedy available to those parties who are embroiled in a controversy that otherwise comes within the court's jurisdiction. *Colonial Penn Group, Inc. v. Colonial Deposit Co.*, 834 F.2d 229, 232 (1st Cir.1987) (citations omitted); *Cablevision of Boston Ltd. Partnership v. Flynn*, 710 F.Supp. 23, 25 (D.Mass.1989) (citations

surers bear the burden of persuasion and must therefore set forth facts establishing that no genuine issues of material fact exist in this case and that, as matter of law, they should prevail. Under *Sterilite*, they do not prevail as matter of law unless they can prove with conclusive effect *on the sovereigns* that, as matter of fact, the sovereigns cannot establish a claim within the insurance policy. 17 Mass.App.Ct. at 323, 458 N.E.2d 338. In the summary judgment context, the *Sterilite* burden constitutes a virtually unscalable peak. This is because no matter how exhaustive and detailed the evidentiary submissions made by the insurers, they will inevitably fail to carry their legal burden in separate declaratory judgment actions such as these (where the plaintiffs in the underlying action are not parties) because they cannot bind those plaintiffs and thus cannot prove their contentions "with conclusive effect" on them.[10]

This case, however, is unique in that a complete universe of facts has been developed in the underlying case. The Court ordered the parties to file requests for admissions for all facts they intend to prove at trial and the time for filing requests has expired. Proof of any fact for which no request for admission has been made is precluded in the underlying case. *Acushnet IV, supra* note 1, at 1030 n. 19. Thus, the insurers can rely upon this complete factual record when attempting to prove with conclusive effect on the sovereigns that, as matter of fact, the sovereigns cannot establish a claim within the insurance policy.

■ After being given several opportunities to put before the Court factual matters in the record which constitute genuine issues of material fact concerning sudden or accidental releases for which Fireman's Fund would be liable, Aerovox asserted that during its tenure at the facility, cooling system malfunctions occurred causing the release of PCBs. Further, Aerovox also put forward evidence through one of its employees, Mr. Dolph Montiero, that "once or twice a year" the impregnation tanks would overfill causing impregnants to flow into the vacuum pumps and thereby release PCBs. Belleville has asserted that a fire occurred at the facility resulting in the release of PCBs due to the scouring action of the fire department hoses. In addition, in 1975, during the transfer of Aroclor from one storage tank to another, 500 gallons of oil containing PCB's were spilled and presumably released into the environment. Sovereigns' Request for Admission 1051. Unlike *Great Lakes Container Corp. v. Nat'l Union Fire Ins. Co.*, 727 F.2d 30, 33 (1st Cir.1984) (holding that, under New Hampshire law, "[p]roperty damage resulting [as a concomitant of regular business activity] falls squarely within the [pollution exclusion]"), this Court holds that there is a genuine issue of material fact whether such incidents, if proved, are concomitant to the insureds' regular business activity and are thus "sudden and accidental".[11] Further, even if such incidents are concomitant to the insureds' regular business activity, this Court does not read *Great Lakes* to say that, just because

omitted) (appeal pending). Here, the Court's subject matter jurisdiction derives from the parties' diversity of citizenship and the law of Massachusetts provides the rule of decision. The *Sterilite* decision states that law. Accordingly, even if there were absolutely no issues of fact as between the insurers and their insureds in their several actions, the insurers would still not be "entitled to a judgment as ... matter of [state] law" and summary judgment still would not lie since the sovereigns cannot be conclusively bound by a determination in the insurance cases.

**10.** The instant case well illustrates the futility under *Sterilite* of an insurer's attempt to avoid that duty to defend by way of summary judg-

ment where the plaintiff in the underlying action remains a non-party. Make no mistake, the insurers here have filed detailed and comprehensive evidentiary materials which, if unrebutted at trial, would absolve them from any duty to indemnify their insureds.

**11.** The Court notes that both Belleville and Aerovox have put forward other examples of releases which they term as "sudden and accidental". The Court need not and does not consider them at this juncture as it has found that the insurers cannot prove with conclusive effect on the sovereigns that the PCB releases that resulted from the cooling system malfunctions, the impregnation tank overfills, the fire and spill are non-sudden and non-accidental.

one's business involves the creation of some hazardous waste, there is a mandatory presumption that the pollution exclusion clause is activated and there is no coverage. *Accord U.S. Fidelity and Gas Co. v. Thomas Solvent Co.*, 683 F.Supp. 1139, 1160 (W.D.Mich.1988) ("I do not read *Great Lakes* to stand for the proposition that whenever one's ongoing business involves in some way hazardous wastes that there is a mandatory presumption that no instance of pollution can be 'sudden and accidental' or unexpected or unintended.").

The insurers assert that summary judgment is proper because the insureds have not adequately specified when such incidents occurred and therefore have not met their burden under *Celotex.* The Court rules that the insureds' burden under *Celotex,* when viewed in conjunction with *Sterilite,* has been met. Rather, it is the insurers' burden under Rule 56 and *Sterilite* that has not been satisfied here. Lumbermens and Fireman's Fund have failed to make a showing sufficient to establish the existence of an element essential to their case and on which they bear the burden of proof. The substantive law in Massachusetts sets forth the standard that insurance companies must meet when attempting to get out from under their duty to defend. The insurers must prove "with conclusive affect on the [sovereigns] that as matter of fact—as distinguished from the appearances of the complaint and policy—the [sovereigns] cannot establish a claim within the insurance" for the release of PCBs that resulted from the cooling system malfunctions, the overfill of the impregnation tank, the 500 gallon spill, and the fire. *Sterilite,* 17 Mass.App.Ct. at 323, 458 N.E.2d 338. Because there is a genuine issue of material fact as to whether these incidents were sudden and accidental and thus fall within the policy and a possibility that the sovereigns' claims encompass PCBs released as a result of such incidents, the Court denies the insurers' motion for summary judgment on the duty-to-defend portion of the pollution exclusion issue.

In *Sterilite*, the Court held that the duty to defend was "distinct from and of broader scope than the further obligation to indemnify the insured against judgments obtained against it within the policy coverage." *Id.* at 318 n. 4, 458 N.E.2d 338; *see Newell–Blais Post # 443, Veterans of Foreign Wars v. Shelby Mutual Ins. Co.*, 396 Mass. 633, 638, 487 N.E.2d 1371 (1986) ("[T]he obligation to indemnify does not ineluctably follow from the duty to defend."). A final decision on this issue awaits the facts elucidated in the trial of the underlying case. Although a duty to defend has been found, it would be premature to rule on the indemnity issue at this juncture. Thus, the insurers' motion for summary judgement on the indemnity portion of the pollution exclusion issue is also denied, albeit without prejudice to its renewal upon a more complete record, or after the trial.

## III. OCCURRENCE

Lumbermens made a second motion for summary judgment, pursuant to Rule 56, on the ground that there has been no "occurrence" within the meaning of any of the insurance policies issued to Belleville. The term "occurrence" is defined in said policies as:

> an accident, including continuous or repeated exposure to conditions, which results in ... property damage neither expected nor intended from the standpoint of the insured....

The substantive burden of proving the existence of an occurrence falls upon Belleville. *See* 19 G. Couch, *Cyclopedia of Insurance Law,* sec. 79:315, at 255 (2d ed. 1983); *cf. deMars v. Equitable Life Assurance Soc'y of the United States,* 610 F.2d 55, 57 (1st Cir.1979) (holding that the plaintiff bore the burden "of convincing the jury ... that the cause of death [of plaintiff's decedent-insured] met the policy terms...."). In order to establish an occurrence, Belleville must prove that it did not expect or intend the property damage alleged by the sovereigns.[12]

12. For a discussion of the differences between pollution exclusion and occurrence, *see supra* section II at p. 1268–1269 n. 8.

"Property damage" is defined in the policies as:

1. physical injury to or destruction of tangible property which occurs during the policy period including the loss of use thereof at any time resulting therefrom, or

2. the loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

Pursuant to this definition, property damage equals injury, destruction, or loss of use during the policy period. Thus, Belleville must prove that it neither expected nor intended any injury caused by its release of PCBs. Logically, in order to prove that it neither expected nor intended the injury or loss of use, Belleville must admit that it released PCBs and that there was injury or lost use. Thus, as was the case with the pollution exclusion clause, the policy in effect places the insured in the position of admitting liability in the underlying action in order to maintain coverage.

However, while it is Belleville's substantive burden to establish an occurrence, Lumbermens, having brought this summary judgment motion, bears an initial burden of production procedurally. Specifically, Lumbermens must produce evidence to show that there is no genuine issue of material fact as to whether the property damage was expected and intended by Belleville and that Lumbermens is entitled to summary judgment as matter of law.

Belleville points to certain incidents and terms them "sudden and accidental." [13] Should Belleville prove those discharges took place and that they were in fact sudden and accidental, it follows logically that the resulting harm caused by them would be unexpected and unintended. On this point, however (unlike the pollution exclusion issue where it is Lumbermens who bears the burden of proof), it is Belleville which bears the burden of proving an occurrence. Belleville has not come forward

with actual evidence and thus Lumbermens insists it is entitled to summary judgment at once. The Court disagrees, ruling that a grant of summary judgment would be premature. Until the Remedial Investigation/Feasibility Study (the "Study") is complete, the exact scope of even the claimed property damage will remain unknown. Further, even if the exact scope of the damage were known, what the sovereigns will be able to prove is unknown. Thus, until such time as the Court knows the exact damage proven and the releases that caused that damage it cannot rule whether such damage was expected or intended. If the property damage is nondivisible, the Court may have to determine the percentage of property damage that was caused by an occurrence and the percentage that was not. Further, some of the property damage occasioned by releases pursuant to regular business activity may have been federally permitted and thus Belleville may not be held liable. Due to the inadequacy of the present record, therefore, it would be improvident to grant summary judgment at this juncture.

Lumbermens, however, presses on to argue that no occurrence took place under the policy because—whatever the actual *extent* of the property damage—it was an expected or intended result of Belleville's business operations. It supports its argument with a variety of evidence: *viz.*, references to warnings and memoranda given to Belleville by Monsanto, the supplier of PCBs to Belleville and its predecessor; conversations between employees at Belleville regarding "biocumulation" (sic) of PCBs in fish and birds; the chemical nature of PCBs and their persistence in the environment; various admissions by Belleville that it was aware that other individuals or entities feared the danger posed by PCBs; and that Belleville knew that it was releasing PCBs into the environment.

■ Belleville adequately rebuts Lumbermens' assertions regarding the releases that allegedly resulted from its regular

---

**13.** For a listing of some of the releases Belleville contends are "sudden and accidental," *see supra* Section II at p. 1270 and n. 11.

business operations by presenting evidence that although the facility was purchased in 1973, Clifford Tuttle, the president of Belleville, did not learn that PCBs were suspected of presenting environmental problems until 1974. Moreover, while certain high ranking Belleville employees may have become aware of the fears expressed by others regarding the harm done by PCBs, they did not share those fears as they were informed by at least one Monsanto employee in 1972 or 1973 that, in his opinion, the "alleged" PCB problem was one "invented by Congress," James G. Bryant Deposition, vol. 2., at 37–38, 62, and that Aroclor 1016, which Belleville used during its tenure at the facility, biodegrades rapidly. *Id.* at 38, 54. Finally, and perhaps most persuasively, Belleville was issued a federal permit in 1975. Such permit allowed Belleville to discharge PCBs so long as it complied with the permit's terms.[14] Its issuance implies that the federal government did not consider certain levels of PCB's dangerous.

There is an occurrence under the policy if the damage was not intended but was caused by an intentional act, *supra* at 1268–1269 n. 8. Similarly, Massachusetts courts have held that an unintentional result of an intentional act is still an accident:

the resulting injury which ensues from the volitional act of an insured is still an "accident" within the meaning of an insurance policy if the insured does not *specifically intend* to cause the resulting harm or is not substantially certain that such harm will occur.

*Quincy Mutual Fire Ins. Co. v. Abernathy*, 393 Mass. at 84, 469 N.E.2d 797 (and cases cited) (emphasis added).

Lumbermens has shouldered its burden of producing evidence that Belleville was clearly aware that it used PCBs in its manufacturing process. It has not, however, demonstrated that there is no genuine issue of material fact whether Belleville expected or intended the contamination of the Harbor.[15] The Court cannot hold as matter of law, on the record before it, that Belleville was substantially certain that the asserted property damage would ensue. Unlike *Travelers Ins. Co. v. Waltham Indus. Laboratories Corp.*, 883 F.2d 1092, 1099 (1st Cir.1989) (holding that defendant "must have known of the corrosive effect of acids, caustics and cyanides[,] but even if he was ignorant, he was put on notice repeatedly and frequently of what was happening") and *City of Newton v. Krasnigor*, 404 Mass. 682, 536 N.E.2d 1078 (1989) (holding that the finding of intent to start a fire in a school on the part of the insureds' child requires the conclusion, as matter of law, that the child intended to cause some property damage, at least in the absence of evidence of any other motive in starting the fire), this Court cannot on this record conclude that at the time these PCBs were released it was self-evident that they would cause the property damage at issue. This Court cannot rule that "from the very nature of the act, harm to the injured party must have been intended." *Id.* at n. 7 (and cases cited).

Lumbermens has not carried its burden. Although it has shown that some of Belleville's releases were intentional, it has not proved that there is no genuine issue as to whether the damage was in fact expected or intended. Further, there is a genuine issue whether some of the releases them-

14. The Court acknowledges that the parties dispute at what date the sovereigns, through the permit process, began to authorize certain releases of PCBs. The arguments appear to range from the filing of the application for the permit in 1971, *see* Supplemental Memorandum of Aerovox Incorporated with Regard to Federally Permitted Releases (Docket # 1209) at 4–5; Opposition of the Defendant Belleville Industries, Inc. to the Plaintiffs' Motion for Partial Summary Judgment as to Certain Defenses Asserted by Belleville Industries, Inc., and Motion to Exclude Evidence at the Upcoming Trial and Brief in Support of Said Opposition (Docket # 1153) at 2, to the actual listing of PCBs as a substance

allowed to be released at a particular level by this permit in 1976, *see* Memorandum in Opposition to Motion of Aerovox Incorporated for Summary Judgment with Respect to Federally Permitted Releases (Docket # 845) at 10.

15. The Court notes that where the insured had the intent to cause some property damage, "[t]he insured need not intend to cause the exact extent of the injury which results, in order for the exclusion to apply." *City of Newton v. Krasnigor*, 404 Mass. 682, 685, 536 N.E.2d 1078 (1989).

selves were intentional and therefore whether the damage related to those releases was expected or intended. The resolution of these issues awaits a trial on the merits.

## IV. TRIGGER OF COVERAGE

The insurers have also filed motions for summary judgment on the trigger of coverage issue. The various policies provide coverage if property damage occurred during the policy period. The issue presented by this motion is: when should the property damage at issue in this case be held to have occurred?

As the court said in *Eagle–Picher Indus., Inc. v. Liberty Mutual Ins. Co.*, 523 F.Supp. 110, 114 (D.Mass.1981), *modified on other grounds*, 682 F.2d 12 (1st Cir. 1982), *cert. denied*, 460 U.S. 1028, 103 S.Ct. 1280, 75 L.Ed.2d 500 (1983), "[t]here can be no question but that the aspect of the occurrence which must take place within the policy period ... is the 'result,' that is, the time when the accident or injurious exposure produces ... injury." *See also Appalachian Ins. Co. v. Liberty Mutual Ins. Co.*, 676 F.2d 56, 62 (3rd Cir.1982) (quoting *Eagle–Picher*); *Triangle Publications, Inc. v. Liberty Mutual Ins. Co.*, 703 F.Supp 367, 370 (E.D. Pa 1989) (quoting *Appalachian Ins.*). Because the language of the policies in question clearly comports with this reading, *see supra* Section II, this Court holds that the "occurrence" provision unambiguously means that the injury must take place during the policy period in order for coverage to be provided.[16]

There are at least six theories for determining when the actual injury or damage took place in this case. First, the wrongful act theory states that the injury or damage took place when the PCBs were improperly disposed. Second, under the exposure theory, injury or damage took place when the PCBs leeched into the environment. *See Continental Ins. Co. v. Northeastern Pharmaceutical and Chem. Co.*, 811 F.2d 1180, 1189 (8th Cir.1987) ("[E]nvironmental damage occurs at the moment that hazardous wastes are improperly released into the environment and [the] liability policy in effect at the time this damage is caused provides coverage...."), *modified on other grounds after reh'g en banc*, 842 F.2d 977 (8th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988); *Ins. Co. of North America v. Forty Eight Insulations, Inc.*, 633 F.2d 1212, 1217–22 (6th Cir.1980), *modified on other grounds after reh'g en banc*, 657 F.2d 814 (6th Cir.1981), *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981). Third, there is the injury-in-fact theory, according to which the injury or damage occurred when the number of PCBs in the Harbor was such that the Harbor was actually injured or contaminated. *See American Home Products Corp. v. Liberty Mutual Ins. Co.*, 748 F.2d 760, 765 (2d Cir.1984). A fourth theory is the manifestation theory: coverage is triggered if the injury or damage became "reasonably capable of ... diagnosis" during the policy period. *Eagle–Picher Indus., Inc. v. Liberty Mutual Ins. Co.*, 682 F.2d 12, 25 (1st Cir.1982), *cert. denied*, 460 U.S. 1028, 103 S.Ct. 1280, 75 L.Ed.2d 500 (1983); *American Home Assurance Co. v. Libby–Owen–Ford Co.*, 786 F.2d 22, 30 (1st Cir.1986) ("[T]he test for determining the date of the occurrence should be the time at which a reasonable person would be aware that a defect exists that may give rise to a cause of action."). Fifth is the first discovery theory, which posits that the injury and damage took place when the sovereigns actually discovered the pollution.[17] *Headley v. St. Paul Fire and Marine Ins. Co.*, 712 F.Supp. 745, 748 (D.S.C.1989) (The occurrence took place

---

**16.** Note that it is the "injury" or "damage" that must take place during the policy period and not the monetary quantification of the injury or injuries, *i.e.*, the "damages." *See Acushnet V*, at 681–83, for a discussion of the differences in these terms.

**17.** Some courts have melded the manifestation and first discovery approaches. *See Bartholo-* *mew v. Ins. Co. of North America*, 502 F.Supp. 246, 252–54 (D.R.I.1980) (Occurrence took place when the plaintiff knew [discovery] or reasonably should have known that a defect existed [manifestation]); *Allstate Ins. Co. v. Quinn Constr. Co.*, 713 F.Supp. 35, 39 (D.Mass.1989) (adopting "knew or should have known" approach).

when the property owner "first became aware of the effluent discharge."); *Pittsburg Corning Corp. v. Travelers Indem. Co.*, No. 84–3985, 1988 WL 5291 (E.D.Pa. Jan. 20, 1988) (WESTLAW, Allfeds library, DCT file) (Trigger of coverage with respect to property damage takes place upon discovery of damage in asbestos case.).[18] Sixth and final, injury or damage took place under the continuous trigger theory at the time of exposure and manifestation. *Keene Corp. v. Ins. Co. of North America*, 667 F.2d 1034, 1047 (D.C.Cir.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982).[19]

The insurers argue that it is not the injury which must take place during the policy period but rather the first discovery or manifestation of that injury.[20] The insureds argue that the plain terms of the policy make clear that the injury-in-fact standard is the correct one. The submissions to the court point to no Massachusetts case directly on point. However, in a somewhat analogous context, the Supreme Judicial Court interpreted the timing of an

occurrence in a design defect property damage case to hold that " '[t]he time of the occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed, but the time when the complaining party was actually damaged.' " *Continental Cas. Co. v. Gilbane Bldg. Co.*, 391 Mass. 143, 152, 461 N.E.2d 209 (1984) (quoting *Bartholomew v. Ins. Co. of North America*, 502 F.Supp. 246, 252 [D.R.I.1980], quoting in turn *United States Fidelity & Guar. Co. v. American Ins. Co.*, 169 Ind.App. 1, 7, 345 N.E.2d 267 [1976], *aff'd sub nom. Bartholomew v. Appalachian Ins. Co.*, 655 F.2d 27 [1st Cir.1981]). Thus, the Supreme Judicial Court clearly rejected the commission of the wrongful act as the time the damage or injury takes place. Further, while *Gilbane* cites the "actually damaged" language of *Bartholomew*, it neither expressly adopts *Bartholomew's* discoverability standard nor specifically defines "actually damaged" to equal the injury-in-fact approach.[21]

18. The same court adopted the continuous trigger theory with respect to physical injuries from asbestos in a separate opinion issued the same day. *Pittsburg Corning Corp. v. Travelers Indem. Co.*, No. 84–3985, 1988 WL 5301 (E.D.Pa. Jan. 20, 1988) (WESTLAW, Allfeds Library, DCT file).

19. The Court notes that it is possible that the release, leeching, contamination, manifestation, and first discovery of PCBs may all take place at the same time. Thus, under certain scenarios, insurer liability would be the same no matter which approach was used.

20. Lumbermens asserts it is following the first discovery approach when in fact it is advocating the manifestation approach. "Under this extensive body of well-settled precedent, it is clear that the 'first discovery' principle must be applied in this case, and that the Lumbermens policies under which coverage might be available to Belleville, if any, would be those in effect at the time that a 'reasonable person would [have been] aware that a defect [in New Bedford Harbor] exist[ed] that may [have given] rise to a cause of action' based on the PCB contamination in New Bedford." Memorandum of Plaintiff Lumbermens Mutual Casualty Company in Support of its Motion for Partial Summary Judgment Regarding the "Trigger-of-Coverage" Issue (Docket # 792) at 10–11 (brack-

eted material in Memorandum) (quoting *American Home Assurance Co.*, 786 F.2d at 30).

21. Although *Bartholomew* first says that injury takes place " 'not at the time the wrongful act [is] committed, but the time when the complaining party [is] actually damaged,' " 502 F.Supp. at 252 (seemingly adopting the injury-in-fact analysis) (quoting *United States Fidelity & Guaranty Co. v. American Ins. Co.*, 169 Ind.App. 1, 345 N.E.2d 267, 270 [1976] ), it goes on to hold that the complaining party is actually damaged when the "plaintiffs knew, or reasonably should have known, that the [product] was fundamentally flawed and incapable of fulfilling its intended purpose...." 502 F.Supp. at 254 (construing Rhode Island law). The Court thereby adopts an approach similar to *Eagle–Picher*, 682 F.2d at 25, where the First Circuit in connection with both Ohio and Illinois law held coverage was triggered when the injury, in that case asbestosis, became "reasonably capable of ... diagnosis," thus holding that injury occurs upon discoverability, not necessarily when discovered. *See also American Home Assurance Co.*, 786 F.2d at 26 n. 11, 30 (construing Ohio law and holding that the date of occurrence is the date that the injured party "reasonably would be aware that a defect exists that may give rise to a cause of action"). It seems to this Court under the terms of the policies and the existing case law it matters not when the injury was *actually* discovered.

■ *Gilbane* remains silent on exactly what "actually damaged" means. Thus, after *Gilbane,* nearly all the possible approaches to resolving the issue of the timing of the onset of the actual damage remain viable.[22] A crucial factor in determining when an injury occurs for purposes of insurance coverage is the nature of the injury.[23] This Court is reluctant to determine the standard of trigger without a full factual record on this issue. Because the Court rules there are genuine issues of material fact as to the scope of the property damage and as to whether an occurrence has taken place under the policies, it declines to determine when the actual damage in this case took place and thus what policies are triggered. Further, even if the Court decided that first discovery or manifestation was the correct approach, summary judgment would still be denied because there is a genuine issue of material fact as to when the property damage was discovered or discoverable. A motion for summary judgment may be denied if the arguments of the parties have failed to clarify the underlying facts. *See George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 424 F.2d 25, 36 (1st Cir.), *cert. denied,* 400 U.S. 850, 91 S.Ct. 54, 27 L.Ed.2d 88 (1970). The party opposing the motion for summary judgement has a right to a trial where there is the slightest doubt as to the facts in a case. *United States v. New England Merchants Nat'l Bank,* 465 F.Supp 83 (D. Mass 1979).

Even if there were no issues of material fact as to these issues, the insurers have not met their burden under *Sterilite* of proving with conclusive effect on the sovereigns that no property damage or injury occurred during the respective policy periods. Some courts have held that, in the hazardous waste context, damage occurs at the moment of release into the environment and that the policy in effect at the time of release provides coverage. *Northeastern Pharmaceutical,* 811 F.2d at 1189; *Firemen's Fund Ins. Cos. v. Ex–Cello–O Corp.,* 685 F.Supp. 621, 626 (E.D.Mich. 1987) ("[E]ach exposure of the environment to a pollutant constitutes an occurrence and triggers coverage"); *Centennial Ins. Co. v. Lumbermens Mutual Casualty Co.,* 677 F.Supp. 342, 347 (E.D. Pa 1987) ("Each release caused property damage and each release, consequently, constitutes an occurrence as of the date of the release and the simultaneous damage").

It is possible that the sovereigns could prove that each non-permitted release equals an injury and that therefore every insurer of an entity that released non-permitted PCB's would be liable.[24] Further, it is not clear from this record exactly how many occurrences caused the property damage at issue in this case. *See Bartholomew,* 502 F.Supp. at 251 ("Before trying to pinpoint one [period of time] ... as the 'occurrence,' it must be asked whether the ... incident gave rise to multiple 'ocurrences' each representing a portion of plaintiffs' total damages.... [I]f '[t]here was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage' ... there has been but one occurrence, even though several discrete items of damage resulted") (citation omitted) (quoting *Truck Ins. Exchange v. Rohde,* 49 Wash.2d 465, 471, 303 P.2d 659, 662 [1956] ). *See also Indus. Steel Container Co. v. Fireman's Fund Ins. Co.,* 399 N.W.2d 156, 159 (Minn.App.1987) ("[i]n cases involving long exposure to a toxic substance there can be damage with

---

22. As the Court in *Bartholomew* noted, "[u]nfortunately, conceding the applicability of the 'time of actual damage' standard does not bring this case much closer to solution. When does damage actually occur, as a matter of law, in a situation where damage was actually occurring, as a matter of fact, for a period of ... years?" 502 F.Supp. at 252.

23. *See Pittsburgh Corning Corp. v. Travelers Indem. Co.,* No. 84–3985 (E.D.Pa. Jan. 20, 1988). There, in two separate opinions, the court adopted the first discovery theory with respect to property damage resulting from asbestos and the continuous trigger theory with respect to physical injury.

24. The Court notes that if the injury is divisible and both the release and damage took place pre-enactment then there would be no recovery for natural resource damages. *Acushnet V, supra* note 1, at 685–86. However, response costs would still be recoverable.

more than one manifestation and more than one insurance policy can afford coverage"), *rev. denied* (Mar. 18, 1987) (*see* Shepard's N.W.2d citations). Although on this record the Court is not inclined to reach the question of which trigger theory is appropriate under Massachusetts law, it notes that it may be proven that each release equals an injury to the Harbor. For the reasons set forth above, the insureds' motions for summary judgment on the trigger of coverage issue are denied.[25]

## V. LATE NOTICE

■ Lumbermens has also moved for summary judgment on the ground that Belleville has failed to comply with the notice provisions contained in the insurance policies issued by Lumbermens to Belleville. Such provisions provide that "[i]n the event of an occurrence, written notice ... shall be given [to the insurers] as soon as practicable." As noted in Section II, *supra,* "occurrence" is defined under the terms of the policy as "an accident, including continuous or repeated exposure to conditions, which results in ... property damage neither expected nor intended from the standpoint of the insured." As disclosed, *supra* Section II at 1268, "property damage" is defined as:

1. physical injury to or destruction of tangible property which occurs during the policy period including the loss of use thereof at any time resulting therefrom, or

2. the loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

Lumbermens asserts that Massachusetts courts strictly construe notice clauses in insurance contracts and that as a matter of law a delay of eight years before providing

notice does not constitute giving notice "as soon as practicable." Lumbermens argues further that, because Belleville failed to comply with the terms of the insurance contract, Lumbermens has no coverage obligations.

Lumbermens argues that there is no genuine issue of material fact that as of September 1976—the date Clifford Tuttle, President of Belleville, sent a certain letter to Marshall Butler, a high-ranking official of AVX, Inc. ("AVX") regarding potential liability—Belleville knew of an occurrence under the policy and thus should have provided notice. That letter stated that the EPA found quantities of PCBs in shellfish in the Acushnet River and "should the state pursue a course of action mandating a clean up of the river and an assertion of liability against past users of PCBs for all or any portion of the clean up costs, it would appear that [AVX] would most certainly be involved in such a claim." The letter went on to say that:

> what the EPA has recently 'discovered' is the presence of high quantities of PCBs in the river and harbor which do not result from the present usage of PCBs but is an accumulation of PCBs from uses and practices prior to 1970 when there was no suspicion that these substances offered any threat to the environment.... Since there would appear to be some potential liability if a river clean up program is mandated, [Belleville] felt that [AVX] should be notified of this potential liability.

Belleville asserts that such language supports its contention that it had no knowledge of an occurrence at that point in time and, further, that it had no knowledge of an occurrence prior to October 17, 1977, the effective date of Mass.Gen.Laws ch. 175, sec. 112. That section provides that insurers in liability cases such as this one must prove prejudice in order to obviate cover-

---

**25.** In a related case, No. 84–2044–Y, Aetna Casualty & Surety Company has filed a motion for partial summary judgement against Cornell–Dublier Electronics, Inc. and Federal Pacific Electric Company on the trigger of coverage issue. That motion is denied on the same grounds as the motions discussed herein. In broad brush, the sovereigns are seeking relief for the contam-

ination of the Harbor. The Court concludes that there is a genuine issue of material fact as to when the Harbor was actually damaged. Further, even under Aetna's approach to the trigger issue, summary judgment would be improvident as there is a genuine issue of material fact as to when the property damage was discovered or discoverable.

age for lack of notice. Belleville argues that Lumbermens must prove prejudice in order to prevail on this motion.[26]

Lumbermens misconstrues the standard by which Belleville must give notice. It argues that Belleville had the burden of proving that it gave written notice as soon as practicable after it had "knowledge of the possibility of future claims," citing *Liberty Mutual Ins. Co. v. Gibbs*, 773 F.2d 15 (1st Cir.1985). That case, however, is inapposite. In *Gibbs*, the policy required the insured to give notice as soon as reasonably possible upon knowledge of "any loss or losses *which may give rise to a claim* under that policy." *Id.* at 17 (emphasis added). In the instant case the insured need only give notice "[i]n the event of an occurrence." The portion of the contract in question here is unambiguous. The contract contains no requirement that the insured give notice of the "possibility of an occurrence."

In light of the foregoing, the focal question becomes: at what point in time did Belleville know that there had been an occurrence under the policy? Lumbermens asserts that "Belleville had knowledge of the alleged 'occurrence' . . . at least as early as September of 1976." Memorandum of Plaintiff Lumbermens Mutual Casualty Company in Support of Its Motion for Summary Judgment on the Notice Issue (Docket # 1117) at 1. Belleville argues that "[a]t best, the 'facts' [asserted by Lumbermens] support the contention that Belleville was aware that a claim *might be made at some time against some party* for alleged pollution of New Bedford Harbor." Opposition of the Defendant Belleville Industries, Inc. to the Plaintiff Lumbermens Mutual Casualty Company's Motion for Summary Judgment on the Notice Issue and Brief in Support Thereof (Docket # 1119) at 15–16 (emphasis added).

The Court rules that there remains a genuine issue of material fact as to when Belleville had knowledge that property damage had actually taken place under the policy. Unlike *Powell v. Fireman's Fund Ins. Cos.*, 26 Mass.App.Ct. 508, 509, 512–16, 529 N.E.2d 1228 (1988) (holding that, where insured was present at the accident but did not think the incident "involved any potential claim against [him]," delay of five months was not as soon as practicable), *rev. denied*, 403 Mass. 1106, 532 N.E.2d 690 (1988) (table), and *Segal v. Aetna Casualty & Surety Co.*, 337 Mass. 185, 148 N.E.2d 659 (1958) (holding that insured's notice to insurer, four months after the incident, was not "as soon as practicable" where insured was aware of an occurrence a few hours after it happened but thought that the occurrence did not come within the coverage of the policy or that no claim would be brought), in this case it is not clear that the insured was aware that an injury or property damage, for which it was potentially liable, had actually taken place. In *Powell* it was clear at what point in time an "occurrence" or bodily injury happened; in fact the insured was present when it occurred. 26 Mass.App.Ct. at 510, 529 N.E.2d 1228. It is not clear, on the record before the Court in this case, at what point in time there was property damage or an "occurrence." Because the full scope of property damage in the underlying case has not yet been determined, the Court finds it impossible to determine from the facts presented exactly when Belleville first became aware of the existence of an occurrence in this case and, as such, whether it gave notice to Lumbermens "as soon as practicable."[27] Lumbermens' motion for summary judgement on the notice issue is therefore denied.

## VI. ORDER FOR CERTIFICATION

Pursuant to the Uniform Certification of Questions of Law Rule of the Massachusetts Supreme Judicial Court, Rule 1:03,

---

**26.** Because there is a genuine issue of material fact as to when Belleville had knowledge of an occurrence under the policy, the Court need not and does not reach the issue whether Lumbermens is required to, and in fact can, prove prejudice due to late notice.

**27.** Belleville bears the burden at trial of proving that it gave written notice "as soon as practicable" after it had knowledge of an occurrence under the policy. *Segal v. Aetna Casualty & Surety Co.*, 337 Mass. 185, 187, 148 N.E.2d 659 (1958) (and cases cited).

this Court may appropriately certify questions of state law to the Supreme Judicial Court "if there are involved in any proceeding before [this Court] questions of law of this State [*i.e.*, Massachusetts] which may be determinative of the cause then pending in [this Court] and as to which it appears to [this Court] there is no controlling precedent in the decisions of [the Supreme Judicial Court]." 382 Mass. 698, 700 (1981). This case involves a number of such questions, each possibly determinative of a case or cases now pending. Moreover, as to each such question there is no directly applicable controlling precedent of the Massachusetts Supreme Judicial Court. Accordingly, in view of the fact that the pending cases are complex and protracted and bid fair to involve a series of trials over the next several years, the first of which is presently scheduled to commence in February, 1990, this Court deems it advisable, notwithstanding its own resolution of the issues presented by the parties, to certify four questions of Massachusetts state law to the Massachusetts Supreme Judicial Court. The questions, and a brief statement of the grounds for certification, follow.

### 1. The Use of the Word "Sudden" in the Pollution Exclusion Clause

In the body of this opinion, this Court resolves the motions pending before it by following the definition of the word "sudden" given by the Supreme Judicial Court in *New England Gas and Elec. Ass'n. v. Ocean Accident and Guarantee Corp.*, 330 Mass. 640, 116 N.E.2d 671 (1953). That decision, of course, did not address the meaning of the word as it appears in the pollution exclusion clauses of the insurance contracts at issue in these related cases. Nevertheless, this Court ruled that the clause is unambiguous on its face and that the *New England Gas* definition might be employed in resolving the issues presented herein. That conclusion is not free from doubt.

In *Shapiro v. Public Service Mutual Ins. Co.*, 19 Mass.App.Ct. 648, 477 N.E.2d 146 (1985), *rev. denied*, 395 Mass. 1102, 480 N.E.2d 24 (1985) (table), *rev. denied*, 395 Mass. 1105, 482 N.E.2d 328 (1985) (table), the Massachusetts Appeals Court appeared to view the term "sudden" as somewhat ambiguous, thus justifying a construction which draws all inferences against the insurer. Accordingly, in *Shapiro*, the term was employed in the pollution exclusion context in such a fashion as to warrant the conclusion that an event which transpired over some period of time was nevertheless "sudden." In *C.L. Hauthaway & Sons Corp. v. American Motorists Ins. Co.*, 712 F.Supp. 265 (D.Mass.1989), by contrast, another judge of this district concluded, in interpreting the term "sudden" in the pollution exclusion context, that the term was unambiguous. What's more, my colleague expressly declined to follow *Shapiro* in its application of the term "sudden" to an event extending over any appreciable period of time. In light of these varying approaches to the issue, and the absence of a directly-controlling precedent, this Court certifies the following three questions:

(a) Is the word "sudden" as appearing in the pollution exclusion clauses at issue in this case unambiguous?

(b) If the answer to question (a) above is yes, does that term have a temporal quality?

(c) If the answer to question (b) above is yes, what considerations ought this Court employ in determining which events qualify as "sudden"?

### 2. De Minimus Liability to Indemnify Pursuant to the Sterilite Decision

The decision of the Massachusetts Appeals Court in *Sterilite Corp. v. Continental Casualty Co.*, 17 Mass.App.Ct. 316, 458 N.E.2d 338 (1983) (Kaplan, J.), *rev. denied*, 391 Mass. 1102, 459 N.E.2d 826 (1984) clearly sets forth the procedure which an insurer with a duty to defend must follow to bring that duty to an end. This Court reads *Sterilite* as directly declaring the law of the Commonwealth and raises no question concerning it. Nevertheless, its application to the particular circumstances of this case warrants certification. This is so because, while this Court has ruled that the insurers in these related cases have an

undoubted duty to defend, their ultimate duty to indemnify their insureds appears limited to only a small fraction of the damages which may ultimately be recoverable in this case. In aid of the record in addressing the question to be posed, this Court takes judicial notice, Fed.R.Evid. 201, that each of the insurers herein has incurred more than one million dollars in legal costs in providing a defense of its client in the underlying actions. Even so, were it not for the *Sterilite* requirement, there appears virtually no evidence that any significant contribution to the pollution at issue in the underlying case flowed from incidents which were "sudden and accidental." That is, if an insured is liable for PCB pollution of the Acushnet River and New Bedford Harbor as alleged by the sovereigns herein, it appears from the entire record assembled by this Court that the proportion of that pollution which may properly be characterized as "sudden and accidental" is slight compared to the whole, and perhaps infinitesimal. Thus, it is only this small portion of the potential damages as to which the insurers have a duty to indemnify. Nevertheless, it appears clear under *Sterilite* that the insurers have a continuing duty to defend and this Court has so held. However, in the absence of a controlling decision from the Supreme Judicial Court, this Court deems it appropriate to inquire whether, pursuant to the common law of the Commonwealth, there is any procedure whereby an insurer with an undoubted duty to defend but with a negligible duty to indemnify can bring the continuing duty to defend to an end short of conclusively establishing as against the plaintiff in the underlying action the extent of the claim that is covered by the insurance.

### 3. The "Trigger" Issue

In the body of this opinion, this Court has held that the "occurrence" provisions of the insurance policies here at issue require that the injury must take place during the policy period in order for coverage to be provided. In addressing when the injury took place in this case, the Court has identified six different approaches, each supported by case citation. These are: the wrongful act theory, the release theory, the injury-in-fact theory, the manifestation theory, the first discovery theory, and the continuous trigger theory. While the most analogous Supreme Judicial Court decision, *Continental Casualty Co. v. Gilbane Bldg. Co.*, 391 Mass. 143, 146, 461 N.E.2d 209 (1984), rejects the wrongful act theory, it does not provide definitive guidance concerning the manner of determining when the actual injury takes place and thus which policy of insurance provides the coverage. Accordingly, this Court certifies the following query—under the provisions which trigger insurance coverage in the policies at issue in these related cases, what approach is followed under Massachusetts law in determining at what point, or over what period, insurance coverage is to attach?

### 4. General Considerations

The parties are directed, within the thirty day period following October 22, 1989, to assemble a record sufficient for the Massachusetts Supreme Judicial Court to address the questions certified. In that regard, without intending to impose any additional burden on that Court, this Court—in order to obviate any misapprehension as to the current status of the Massachusetts decisional law—invites and expressly certifies to the Supreme Judicial Court the general question whether, as to any aspect of this Court's discussion of Massachusetts state law in these related cases, this Court has erroneously understood or interpreted that law. Naturally, should the Supreme Judicial Court decline to go any further than to address the first three questions certified, this Court will understand that no opinion is expressed concerning the general invitation contained in this question 4. Nevertheless, to make the certification procedure work optimally, this Court desires to extend to the Massachusetts Supreme Judicial Court the invitation to correct error, if any, as to this Court's interpretation of state law herein so as to improve the further course of these proceedings and to "secure the just, speedy and inexpensive

determination" of these actions. *See* Fed. R.Civ.P. 1; Mass.R.Civ.P. 1.

## VII. CONCLUSION

For the reasons expressed herein, the insurers' motions for summary judgement on the pollution exclusion, occurrence, trigger of coverage, and late notice issues are DENIED, and the four questions discussed above are certified to the Massachusetts Supreme Judicial Court.