EDWARD LaPOINTE *vs.* THE SHELBY MUTUAL
INSURANCE COMPANY.

Worcester.   February 10, 1972. — April 7, 1972.

Present: TAURO, C.J., SPIEGEL, REARDON, & BRAUCHER, JJ.

*Insurance,* Motor Vehicle liability insurance, Notice, Contractor's
   insurance, Contribution among insurers.  *Motor Vehicle,* Loading
   or unloading.  *Notice.  Words,* "Loading and unloading," "As soon
   as practicable."

A motor vehicle liability insurance policy, insuring against liability
   for damages caused by the "use of the motor vehicle . . . [including]
   the loading and unloading thereof," covered injuries arising from
   conduct of the insured's employee in delivering by motor truck a
   tank of propane gas ordered by a customer and negligently install-
   ing it at a wrong location in such a manner that the gas seeped
   into a house and exploded.  [562–564]
With respect to a policy of motor vehicle liability insurance requiring
   the insured to give the insurer written notice of a claim against
   him "as soon as practicable," a notice, given by the insured one
   month after an accident involving the "loading and unloading"
   clause in the policy was timely where it appeared that the vagueness
   of the "loading and unloading" clause might not have alerted the
   insured to the fact that the policy covered the accident and that the
   insured had contacted the insurer's agent within two days of the
   accident and the agent had not informed him of possible coverage
   under the policy.  [564–565]
The insurer under a policy of motor vehicle liability insurance whose
   "loading and unloading" clause covered liability of the insured
   arising from a certain accident was not entitled, under a clause of
   the policy respecting "other insurance against a loss covered by this
   policy," to contribution by the insurer under a contractor's liability
   policy covering the same insured but specifically providing that it
   should not apply to the "use, loading or unloading of" a motor
   vehicle at a place such as that where the accident in question
   occurred.  [565–566]

BILL IN EQUITY filed in the Superior Court on Sep-
tember 16, 1966.

The suit was heard by *Rutledge,* J.

*John C. Burns* for the defendant.
*Joseph F. Sawyer, Jr.,* for the plaintiff.

SPIEGEL, J.   This is a bill in equity for declaratory
relief brought in behalf of the Continental Casualty Com-

pany (Continental). The plaintiff is a retail distributor of bottled gas which is supplied to him from Home Gas Company (Home). Continental was the liability insurer of Home which afforded coverage to the plaintiff for personal injury and property damage liability under a manufacturers' and contractors' liability policy. The plaintiff was insured by the defendant The Shelby Mutual Insurance Company (Shelby) under a motor vehicle liability policy which covered the loading and unloading of goods. The bill seeks a declaration that Shelby is indebted to the plaintiff for certain sums of money paid in settlement of several law actions for personal injuries and property damage brought against the plaintiff. The trial judge made "Findings, Rulings and Order for Decree." A final decree was entered declaring, inter alia, that Shelby is indebted to the plaintiff in the sum of $26,350, from which decree Shelby appealed. The judge adopted his "Findings, Rulings and Order for Decree" as his "Report of Material Facts." The evidence is reported.

We summarize pertinent portions of the judge's findings. On or about September 2, 1961, the plaintiff was in the furniture business and was also in the business of selling at retail, and delivering, "tanks of propane gas." The motor vehicle liability policy issued by Shelby became effective on January 1, 1961, and was in effect on September 2, 1961. The plaintiff had two customers for gas who lived at the same address (Smith Lane, Northbridge). One of them was the owner of the building (Gendron) and the other was a tenant (Lapierre). Lapierre placed an order for a "new tank of gas," and an employee of the plaintiff, one Labelle, took the tank of gas (furnished by Home) on the plaintiff's "1957 Chevrolet pickup truck" to the premises occupied by the tenant. The truck was covered under the motor vehicle liability policy issued to the plaintiff by Shelby. When Labelle arrived at the tenant's address he "called up to a young boy who was at a second floor window and asked where the . . . tanks were located, and the boy re-

plied 'At the end of the house.' . . . Labelle saw two tanks on a platform at the left side of the building toward the back. He removed one tank from the platform . . . [and] unloaded the full tank from the truck and transported it by a two-wheeled dolly to the installation. He connected the fresh tank to a tube and to the regulator . . . on the left side of the dwelling. He then returned to the truck and drove away."

Four hours later there was an explosion on the premises which caused damage to property and personal injuries to two occupants of the dwelling.

"[T]here were in fact two gas tank locations at the Smith Lane premises. The location for the Lapierre tanks was at the rear of the dwelling and the location for the Gendron tanks was at the left side of the property. By mistake . . . Labelle had connected the fresh tank at the Gendron location. . . . Gendron had ceased taking gas from the . . . [plaintiff], and the pipe or tube inside the dwelling from the Gendron location had been cut or severed before the time of delivery. . . . [G]as seeping or escaping into the dwelling house had accumulated and exploded, causing the aforementioned damage and injuries."

The judge also found that the plaintiff's "employee should have known the correct location of tanks for use by Lapierre, and, if he did not, he should have made greater efforts to locate the correct installation." The judge concluded that "the damage and injuries aforesaid were due to negligence for which the . . . [plaintiff] was liable."

Within a day or two after the accident, LaPointe "contacted" one Gerald Gaudette, president of the Gaudette Insurance Agency, who had written the insurance on the LaPointe vehicle as agent for Shelby. Gaudette "customarily prepared statements addressed to . . . [Shelby] when accidents were reported to him." In this case, however, he neither forwarded a report of the accident to Shelby nor requested the plaintiff to file a written report.

"[A]n adjuster or investigator from Continental . . . visited the . . . [plaintiff] on or about October 3, 1961, and received a full statement from . . . [him] as to the occurrence. . . . [The] adjuster discussed with . . . [the plaintiff] the matter of other coverage . . . [he] might have, such as motor vehicle insurance."

The plaintiff "approximately a month after the gas explosion occurrence, wrote a letter to Shelby . . . , notifying . . . [it] of the circumstances relating to the September 2, 1961, accident. . . . [A] representative of Shelby . . . visited . . . [the plaintiff] within the latter months of 1961 and discussed the Smith Lane accident with him, advising . . . [him] that this loss did not come under his automobile policy."

Actions were brought against the plaintiff by those suffering personal injuries or property damage from the September 2, 1961, accident by writs dated December, 1962, and August, 1963. The plaintiff's attorney, on or about January 17, 1963, demanded, in writing, that Shelby take over the defence of the first action. "By letter dated January 29, 1963, Shelby . . . notified . . . [the] attorney that it would not voluntarily take over . . . [the] defense. On or about June 6, 1963, Shelby . . . advised the . . . attorney that 'The incident was not caused by any activities on the part of our assured . . . that would fall within the activities covered by the Loading and Unloading provision of said policy.' "

"At the time . . . [the] cases were reached for trial, the . . . [plaintiff's] attorney notified Shelby . . . of the imminence of trial. Again Shelby . . . did not come in to handle the defense."

At the time the cases were reached for trial, Continental paid a total of $26,350 in settlement of the actions brought against the plaintiff. This money was paid to the plaintiff in the form of a loan, repayable to Continental "only in the event and to the extent that any net recovery is made by . . . [the plaintiff] under a motor vehicle liability policy . . . for bodily injuries and property damage arising out of the operation of a motor

vehicle . . . and the loading and unloading thereof as a result of personal injuries and property damage sustained on or about September 2, 1961, at Smith Lane." Under a document captioned, "Loan Receipt," the plaintiff agreed to promptly commence suit against the insurer described above, in his own name, "but at the expense and under the exclusive direction and in control of . . . Continental."

1. The Shelby policy covers liability "caused by the ownership, operation, maintenance, control of use of the insured motor vehicle." The declaration, which is part of the policy, provides that the "use of the motor vehicle . . . includes the loading and unloading thereof." Shelby contends that the trial judge erred in ruling that the "loss occurred within the coverage afforded by the Loading and Unloading provisions of the policy."

This question has received varied treatment from the courts. See Annotations, 160 A. L. R. 1259 and 95 A. L. R. 2d 1122. Couch, Insurance (2d ed.) § 45:123 et seq. We have adopted the so called "complete operation" rule rather than the narrower "coming to rest" theory. *August A. Busch & Co. of Mass. Inc.* v. *Liberty Mut. Ins. Co.* 339 Mass. 239, 241–243. *F. W. Woolworth Co.* v. *Lumbermen's Mut. Cas. Co.* 355 Mass. 211, 214. In the *Busch* case, we discussed the various considerations in interpreting a "loading and unloading" clause, and we need not repeat them here. In particular, we stated that the operation of unloading was a "continuous transaction ending with the deposit of the goods in the hands of the purchaser." Shelby urges that the tank had been completely delivered, and hence the accident was beyond the scope of the policy's coverage. We cannot accept this contention in light of the language in the *Busch* case. A delivery cannot be "complete" until the product reaches its intended purchaser. *Mohawk Valley Fuel Co. Inc.* v. *Home Indem. Co.* 8 Misc. 2d (N. Y.) 445, 448.

Several cases from other jurisdictions support this view. In *Raffel* v. *Travelers Indem. Co.* 141 Conn. 389, the plaintiffs' employee delivered a roll of linoleum to a

customer. It was left standing upright on the customer's porch and later fell on the customer's daughter causing her serious injury. The court, after reviewing the authorities and adopting the "complete operation" rule, stated at page 396 that: "It is reasonable to assume that the operation of unloading did not end until the linoleum was placed where it could be used by its purchaser. If the driver, in carrying forward this mission, was negligent in leaving it where it could, and did, cause injury, that negligent act was a part of the operation of unloading the truck and had a direct causal relation with the truck and the unloading operation."

In *American Motorists Ins. Co.* v. *Nashua Lumber Co. Inc.* 103 N. H. 147, 151, lumber was unloaded by a side porch. A lady tripped over the lumber, sustaining injuries, and sued the lumber company for negligence in placing the lumber. In holding that the insurance company was obligated under its policy to defend the action, the court there said: "We think the better view to be that which holds that the words 'loading and unloading' in the policy are intended to extend rather than to limit the use covered so as to include a continuous operation which includes a proper commercial delivery of the product."

Similar results were reached in *American Auto. Ins. Co.* v. *Master Bldg. Supply & Lumber Co.* 179 F. Supp. 699, 703–704 (D. Md.) (negligent placement of sheetrock in cellar), *Pacific Indem. Co.* v. *Run-A-Ford Co. Inc.* 276 Ala. 311, 315 (negligent placement of parcel next to door), *Mohawk Valley Fuel Co. Inc.* v. *Home Indem. Co.* 8 Misc. 2d (N. Y.) 445, 448 (delivery of oil to the wrong address), and *Penley* v. *Gulf Ins. Co.* 414 P. 2d 305 (Okla.) (negligent delivery of gasoline rather than the requested diesel fuel into a motor grader).

This is not to say that any negligent act committed during the unloading process gives rise to liability within the policy. Compare, e.g., *Hartford Acc. & Indem. Co.* v. *Fireman's Fund Indem. Co.* 298 F. 2d 423 (7th Cir.). There must be a causal connection between the use of the automobile, which includes loading and unloading, and

the accident. This is not a question of "proximate cause" in the ordinary tort sense, but is a question of interpretation of the extent of coverage intended by the words of the insurance contract. *St. Paul Mercury Ins. Co.* v. *Huitt,* 336 F. 2d 37, 43 (6th Cir.). Shelby argues that the injuries arose not out of the unloading of the vehicle by the plaintiff's employee, but rather from the failure of the plaintiff to give his employee "specific instruction as to the delivery of . . . [the] tank." The judge here, however, determined that the plaintiff's employee was negligent because he "should have known the correct location of [the] tanks . . . , and, if he did not, he should have made greater efforts to locate the correct installation." Shelby states no reason why this finding should be declared "plainly wrong." It appears to us that the installation of the tanks was "necessary in order to carry out the delivery" and was "an integral part of the unloading process." *Connecticut Indem. Co.* v. *Less,* 168 F. 2d 420, 425 (1st Cir.). *Lumbermen's Mut. Cas. Co.* v. *Employers' Liab. Assur. Corp. Ltd.* 252 F. 2d 463, 465 (1st Cir.). The employee's assigned task was to deliver the tank of propane gas to Lapierre, and his negligent act in installing it at the wrong location was a part of that delivery.

The fact that the explosion occurred four hours after the negligent act was committed does not alter our view. The accumulating gas was a "continuing agency for harm." *General Acc. Fire & Life Assur. Corp. Ltd.* v. *Hanley Oil Co. Inc.* 321 Mass. 72, 74.

2. Shelby also contends that the plaintiff did not comply with the notice provisions of the policy. The judge found that within a day or two of the accident the plaintiff "contacted" the agent (Gaudette) who had written the Shelby policy on the plaintiff's vehicle, and discussed the accident with him. Although Gaudette ordinarily prepared statements for Shelby when accidents were reported to him, he did not do so in this case. Nor did he request the plaintiff to file a written report. Approximately one month after the accident, apparently just

after an adjuster from Continental had visited the plaintiff, the plaintiff wrote Shelby notifying it of the occurrence.[1]

The pertinent clause requires the insured to give written notice "as soon as practicable." To give notice "as soon as practicable" means within a reasonable time. *Segal* v. *Aetna Cas. & Sur. Co.* 337 Mass. 185, 187–188. In the circumstances of this case, we think that the plaintiff's notice to Shelby, although approximately one month late, was nevertheless timely. In view of the vagueness of the phrase "loading and unloading," and the varied judicial interpretations given it, we can understand how the plaintiff, a layman, could be ignorant of its application to the facts in the instant case. It is apparent that Shelby's agent, Gaudette, did not inform him of possible coverage. This is an important factor in determining the timeliness of his notice. *Canadian Indem. Co.* v. *State Auto. Ins. Assn.* 174 F. Supp. 71, 80 (D. Ore.). See *Home Indem. Co.* v. *Ware*, 285 F. 2d 852, 853–854 (3d Cir.). But cf. *McCarthy* v. *Rendle*, 230 Mass. 35, 38–39; *Segal* v. *Aetna Cas. & Sur. Co.* 337 Mass. 185, 188; *Pawtucket Mut. Ins. Co.* v. *Dolby*, 305 F. Supp. 703, 705–706 (D. Mass.). Moreover, since Shelby denied coverage under the "loading and unloading" clause, and refused to take over the defence of the lawsuits brought against the plaintiff, it is difficult to see how the failure to receive notice until approximately one month after the accident could have prejudiced it. *Canadian Indem. Co.* v. *State Auto Ins. Assn., supra.* But cf. *Duggan* v. *Travelers Indem. Co.* 265 F. Supp. 819, 821–822 (D. Mass.).

3. Shelby's final contention is that the bill for declaratory relief should have been dismissed because all the

---

[1] The judge's precise findings on this point, already quoted, are based, in part, on the plaintiff's testimony that he sent written notice to Shelby after he had been visited by the Continental adjuster. This visit occurred around October 3, although the plaintiff thought that it was around September 10. Shelby contended that it did not receive notice until February, 1963. We see no basis for holding that the judge's findings were plainly wrong.

necessary parties (i.e. Continental) were not joined. G. L. c. 231A, § 8. The Shelby policy provides that: "If the insured has other insurance against a loss covered by this policy the company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss." If liable, Shelby argues, it should have been able to secure contribution from Continental, and failure to join Continental was therefore prejudicial. The Continental policy, however, specifically does not apply to the "ownership, maintenance, operation, use, loading or unloading of . . . automobiles if the accident occurs away from . . . premises [owned by, rented to or controlled by the named insured] or the ways immediately adjoining." Thus, the ruling that the accident occurred within the "unloading" phase foreclosed any question of possible contribution from Continental.

*Decree affirmed with costs*
*of appeal.*