**FIREMAN'S FUND INSURANCE COMPANY, et al., Plaintiffs,**

**v.**

**VALLEY MANUFACTURED PRODUCTS COMPANY, INC., et al., Defendants.**

**VALLEY MANUFACTURED PRODUCTS COMPANY, INC., et al., Plaintiffs,**

**v.**

**AETNA CASUALTY & SURETY COMPANY, et al., Defendants.**

Civ. A. Nos. 85–2606–H, 85–4805–H.

United States District Court, D. Massachusetts.

June 7, 1991.

**1122**

Brian T. Kenner, Martin C. Pentz, Nutter, McClennen & Fish, Michael S. Greco, Michael D. Weisman, Hill and Barlow, Boston, Mass., Stephen J. Smirti, Jr., Rivkin, Radler, Dunne & Bayh, Garden City, N.Y., John Chesny, Drinker Biddle & Reath, Philadelphia, Pa., for Fireman's Fund Insurance Co. and Lumbermens Mut. Cas. Co.

John P. Graceffa, Gallagher & Gallagher, Boston, Mass., for Aetna Cas. Sur. Co.

David B. Chaffin, Wickens, Hare, Koches & Cale, Boston, Mass., Paul R. Koepff, Mudge Rose Guthrie Alexander & Ferdon, New York City, for Insurance Co. of North America.

Deborah S. Griffin, Peabody & Arnold, Boston, Mass., for U.S. Fire Ins. Co.

John A. Wickstrom, Tashjian, Simsarian & Wickstrom, Worcester, Mass., for Mission Nat. Ins. Co.

Ogden N. Lewis, Michael J. Lonergan, Davis Polk & Wardwell, New York City, for Aetna Ins. Co.

Brian T. Kenner, Nutter, McClennen & Fish, Boston, Mass., for Valley Manufactured Products.

Michael Aylward, Morrison, Mahoney & Miller, Boston, Mass., for Groveland Resources Corp.

John P. Ryan, Sloane & Walsh, Boston, Mass., for Hartford Ins. Co.

## ORDER

HARRINGTON, District Judge.

These consolidated cases are declaratory judgment actions by which the parties seek a determination as to whether certain insurance companies (the "insurers") are obligated, pursuant to their respective comprehensive general liability policies, to defend and indemnify their insured (the "policyholders") against claims arising out of the alleged contamination of groundwater situated in Groveland, Massachusetts. Also, in these consolidated cases, certain insurers who have provided excess liability insurance policies seek declaratory judgment as to whether they are obligated under these policies.

This action arises out of the discovery, in 1979, that two of the Town of Groveland's drinking water wells were contaminated with Trichlorethylene ("TCE"). In 1981, after informing the policyholders that they would be held potentially responsible and after entering into a succession of unsuccessful settlement negotiations with the policyholders, the Town sued the policyholders for injuries allegedly arising from the policyholders' contamination of the Town's groundwater and drinking wells. Subsequently, the Department of Environmental Quality Engineering (DEQE) and the Environmental Protection Agency (EPA), after investigation, took various actions with respect to the policyholders, none of which it is necessary to outline here.

Insurers and policyholders have filed motions for summary judgment on several grounds. It is unnecessary to detail each ground upon which each party seeks summary judgment in view of the Court's conclusion that the first ground, namely, late notice and resulting prejudice, is dispositive as to all the parties.

I, therefore, address the insurers' motion for summary judgment on the ground that the policyholders failed to provide timely notice of events that the policyholders now contend were occurrences or claims. The policyholders have also filed a motion for summary judgment seeking a declaration that the insurers cannot prevail on their late notice defense because, among other things, they have suffered no actual prejudice.

Valley Manufactured Products Co., Inc., Groveland Resources Corp., and Valley Screw Products Co. are the policyholders in this action. Each of these companies, at

various times, owned and operated the same manufacturing plant in the Town of Groveland. The insurers insured this plant at various times.

These policyholder-companies made screw machine parts at the Groveland plant. In the 1960s and 1970s, the policyholders used Trichlorethylene ("TCE") as a metal parts cleaner and degreasing agent. For purposes of the motion for summary judgment on the ground of late notice, it is undisputed that, in 1973, the policyholders installed an underground storage tank which was filled with about 500 gallons of TCE. The next day or two the tank was empty and it was discovered that a plug on the bottom of the tank had accidentally become loose allowing the 500 gallons of TCE to leak into the ground. This tank leak allegedly contaminated underground water located beneath the policyholder's property which, in turn, caused the contamination of two of the Town's drinking water wells. The Town's wells were shut down in 1979 because of the contamination.

Beginning in 1980, the Town decontaminated the wells and, in 1981, advised Valley Manufactured Products that it viewed Valley as a probable source of the contamination of the wells. Meetings and negotiations between the Town and the policyholders ensued. These negotiations were unsuccessful and in 1981 the Town sued the policyholders to recover for damages allegedly caused by the contamination. The policyholders did not notify the insurers of the filing of this suit until 1983 and did not notify the insurers of the tank leak, which allegedly caused the contamination until 1986.

Under the terms of the primary policies, the insured was required to give the insurance companies written notice "in the event of an occurrence" "as soon as practicable."[1] In the policies, "occurrence" is defined as "an accident, ... which results, during the policy period, in ... property damage neither expected nor intended from the standpoint of the insured." "Property damage" is defined as "injury to or destruction of tangible property."

 As the policy called for written notice of the occurrence "as soon as practicable" after its happening, the insured was required to notify the insurer within a reasonable time. *See Powell v. Fireman's Fund Ins. Co.*, 26 Mass.App. 508, 513, 529 N.E.2d 1228, 1231; *LaPointe v. Shelby Mut. Ins. Co.*, 361 Mass. 558, 565, 281 N.E.2d 253 (1972). What is a reasonable time is a question of fact, but where the basic facts are undisputed, it becomes a question of law. *Segal v. Aetna Cas. & Sur. Co.*, 337 Mass. 185, 188, 148 N.E.2d 659.

██ On the undisputed facts and for the reasons outlined below, I rule as a matter of law that the insured did not give notice of the occurrence to the insurers within a reasonable period of time and, moreover, that the insurers were prejudiced as a result. This ruling applies to both the primary and the excess insurers. The principle underlying the notice provision, that is, to enable the insurer reasonable and timely opportunity to investigate the underlying claim, applies to both primary and excess policies in the circumstances of this case.[2]

1. The primary policies provide in relevant part:
 In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.
 The quoted language is from a Fireman's Fund primary policy. The definition of "occurrence" appearing in all other primary policies is essentially the same.
 With regard to notice of occurrence, the excess policies provide, in relevant part:

 Upon the happening of an occurrence reasonably likely to involve the company hereunder, written notice shall be given as soon as practicable to the company or any of its authorized agents. Such notice shall contain particulars sufficient to identify the insured and the fullest information obtainable at that time.
 The quoted language is from an excess policy with Insurance Company of North America. The other excess policies contain essentially the same language.

2. It is obvious that the occurrence, the accidental leak contaminating the groundwater resulting in the contamination of two of the Town's drinking water wells, at least by 1979, constitut-

The first question which the Court must address is what effect, if any, a 1977 amendment to Massachusetts General Laws, chapter 175, Section 112, has on the coverage questions raised in this case. In 1977, the Legislature amended Mass.Gen.L. ch. 175, § 112. This amendment provides that "[a]n insurance company shall not deny insurance coverage to an insured because of failure of an insured to seasonably notify an insurance company of an occurrence, incident, claim or of a suit founded upon an occurrence, incident or claim, which may give rise to liability insured against unless the insurance company has been prejudiced thereby." Before the passage of this amendment, an insured's failure to comply with the notice requirements of a policy relieved the insurer of liability on the policy even where the noncompliance caused no prejudice to the insurer.

All parties agree that this amendment applies prospectively only. *See Spooner v. General Acc. Fire & Life Assur. Corp.*, 379 Mass. 377, 397 N.E.2d 1290 (1979). The parties disagree, however, on the date upon which the prospective application is effective. The policyholders contend that the date upon which the policyholders became obligated to notify the insurers of the "occurrence" is the date on which the amendment's application begins. The policyholders argue, accordingly, that they had no duty to notify the insurers of the "occurrence" until after October 16, 1977, the amendment's effective date, and, thus, that the amendment applies to this "occurrence." Accordingly, assert the policyhold-

ers, the insurers must show prejudice as well as untimely notice to deny coverage. By the same token, if the policyholders' duty to notify the insurer of the "occurrence" arose before October 16, 1977, the amendment does not apply to this "occurrence" and, thus, the insurers need show only untimely notice to deny coverage. The policyholders argue that since, in 1973, they allegedly had no actual knowledge of any property damage or of any liability as a result thereof, they had no obligation to notify the insured of the tank leak. According to the policyholders, it was not until 1979, at the earliest, when the well contamination was discovered, that they acquired actual knowledge of the groundwater contamination. Thus, since the duty to notify arose after the date of the amendment, the insurers must show actual prejudice in addition to untimely notice.

The insurers, on the other hand, argue that the operative date of the amendment is the date of execution of the insurance contract. According to the insurers, if the insurance contract was executed before October 16, 1977, then the insurer need only show untimely notice. If, however, the insurance contract was executed after October 16, 1977, then the insurer need show actual prejudice as well as untimely notice.

The Court concludes that the operative date is the date upon which the policyholders became obligated to notify the insurers of the "occurrence" and not the date upon which the insurance contract was executed.

ed the "happening of an occurrence reasonably likely to involve the [excess insurers]." A reasonably prudent policyholder would have notified its excess insurers in 1979 when it became aware of the contamination of the two drinking water wells and would have notified its excess insurers in 1981 when suit was brought.

An excess insurer's liability is dependent upon the primary insurer's fulfilling its obligations of investigation, pursuit of settlement opportunities, and, if necessary, defense of the lawsuit at trial. The excess insurer's liability also depends upon the extent of the primary insurer's limited coverage. Here, the primary insurer is relieved of defending the suit or of providing coverage because of the policyholders' egregiously late notice and its resulting prejudice. The very same factors which prejudicially impact the pri-

mary insurers impact, to an even greater extent, the excess insurers, whose potential liability is much greater than that of the primary insurers and whose liability is dependent upon the determination whether the primary insurers' policies provide coverage. *Littleton Colo. v. Commercial Union Assur. Co.*, 133 F.R.D. 159, 163 (D.Colo. 1990) (excess insurer's liability dependent upon determination whether primary insurers' policies provide coverage). In the circumstances of this case, the policyholders' failure to notify the excess insurers until 1983 was untimely and amounted to prejudicial delay. To hold the excess insurers liable where the primary insurers have been actually prejudiced by the policyholders' failure to notify any of its insurers would be contrary to generally accepted principles of insurance law.

*In re Acushnet River & New Bedford Harbor*, 725 F.Supp. 1264, 1278 (D.Mass.1989).

■ For the purposes of the motion for summary judgment on the ground of late notice, it is undisputed that the sudden and accidental leak of TCE from the storage tank took place in the Spring of 1973, and that this toxic chemical material began to contaminate the groundwater in the Fall of 1973. The policyholders argue, however, that since, at the time of the tank leak in 1973, they had no actual knowledge of the existence of any property damage (contamination to the groundwater), they had no duty to notify their insurers at that time. They assert that it was not until 1979, at the earliest, when they became aware of the TCE contamination of the Town's wells, that they had any duty to notify the insurers of the 1973 tank leak. The policyholders argue, therefore, that their duty to notify arose after October 16, 1977, the effective date of the amendment, and, thus, the insurers must prove actual prejudice as well as untimely notice. The insurers, on the other hand, argue that the policyholders had notice of the "occurrence" in 1973 at the time of the tank leak and, therefore, had a duty to notify the insurers of the leak when it occurred in 1973.

The policyholders cite *In re Acushnet River & New Bedford Harbor*, 725 F.Supp. 1264, 1278 (D.Mass.1989), among other cases, in support of their argument that, unless they had actual knowledge of the property damage (contamination to the groundwater) that resulted from the accident, they had no duty to notify their insurers in 1973. The policyholders assert that since there is at least an issue of fact as to when they acquired actual knowledge of the property damage, the insurers' motion for summary judgment on the ground of late notice must be denied.

In *In re Acushnet, supra*, the insurers in that case argued that there was no genuine issue of material fact as to the date upon which the insured *knew* of an occurrence under the policy and thus, as to the date upon which the insured was obligated to provide notice. The insurers based this argument upon a letter sent by the insured to a predecessor corporation, AVX, Inc., regarding potential liability. Both the insured and AVX had owned and operated the plant in *Acushnet* at different points in time. The letter stated that the EPA found quantities of PCBs in shellfish in the Acushnet River and "should the state pursue a course of action mandating a clean up of the river and an assertion of liability against past users of PCBs for all or any portion of the clean up costs, it would appear that [AVX] would most certainly be involved in such a claim." *In re Acushnet, supra*, at 1277. The letter went on to explain that the EPA had recently discovered high quantities of PCBs in the river and harbor which appeared to be an accumulation of PCBs from uses and practices prior to 1970, the period during which AVX had operated the plant.

The insured in *In re Acushnet* asserted that it had no knowledge of an "occurrence" in 1976 when it wrote the letter and further that it had no knowledge of an occurrence at any time prior to October 16, 1977. The insured argued that, at best, the letter revealed that the insured was aware in 1976 that a claim might be made at some time against some party for alleged pollution of New Bedford Harbor. In *Acushnet*, as in the present case, the parties argued the effect of Mass.Gen.L. ch. 175, § 112 on the insurers' requirement to prove prejudice. The Court did not reach this issue, however, ruling that since there was a genuine issue of material fact as to when the insured had actual knowledge of an occurrence under the policy, the Court did not need to reach the issue of whether the insurer was required to, and in fact could, prove prejudice due to late notice. *In re Acushnet River & New Bedford Harbor*, 725 F.Supp. 1264, 1278 n. 26 (D.Mass.1989). The Court thus, denied the insurers' motion for summary judgment on the ground of late notice, ruling that there was a genuine issue of material fact as to when the insured had actual knowledge of the property damage or occurrence.

The policyholders assert that the circumstances of the instant case are analogous to the circumstances in *Acushnet* and that,

therefore, this Court should rule that they had no duty to notify their insurers of the tank leak until, at the earliest, 1979, after the effective date of the amendment to Mass.Gen.L. ch. 175, § 112. At least, argue the policyholders, there exists an issue of fact as to when they acquired actual knowledge of the property damage and, thus, became obligated to notify the insurers of the leak. However, in *Acushnet*, unlike the present case, the undisputed facts did not reveal that the insured had actual knowledge of any specific incident such as the 500–gallon leakage of a toxic chemical from an underground storage tank. The facts in *Acushnet* revealed merely that the insured was aware that the EPA had found quantities of PCBs in shellfish in a river nearby and that the insured believed that there appeared to be some potential liability if the EPA mandated a river clean up program.

The insurers assert that the facts of the instant case are more analogous to the facts in *Powell v. Fireman's Fund Ins. Co.*, 26 Mass.App.Ct. 508, 513, 529 N.E.2d 1228 (1988). In *Powell*, the plaintiff-claimant was injured at a nightclub owned by the insured. Although the insured was present when the incident occurred, he did not notify his insurer until he was served with the plaintiff's complaint for damages more than a year later.[3] In *Powell*, the insured contended that at the time of the incident he did not believe that it involved any potential claim against him. The *Powell* court ruled, however, that "[e]ven if the insured had reason to believe that the incident was *not* an 'occurrence' within the coverage of the policy ... he was required to give notice to the insurer." The insurers also point to cases such as *Segal v. Aetna Cas. & Sur. Co.*, 337 Mass. 185, 188, 148 N.E.2d 659 (1958), in which the Supreme Judicial Court, quoting from *McCarthy v. Rendle*, 230 Mass. 35, 38–39, 119 N.E. 188 (1918), stated "[i]t is plain that the fact, that the insured has a reasonable and bona fide doubt as to the existence of any injury or of any liability, cannot be used to deprive the insurer of his contractual right

to have an immediate notice of the occurrence of an accident, regardless of the damages that may be claimed to flow from that accident." *Segal, supra*, 337 Mass. at 188, 148 N.E.2d 659. The *Powell* court, and cases cited therein, reasoned that the consequences of the insured's unilateral decision not to report an occurrence of an accident at the time it occurs (irrespective of any good faith belief as to the existence of any liability or injury) are to deny the insurer of the opportunity to investigate the cause and nature of a claim or occurrence while the facts are still fresh in the minds of the parties and while the physical evidence of the occurrence is still fresh. *See Powell*, 26 Mass.App.Ct. at 514, 529 N.E.2d 1228, quoting *Segal v. Aetna Cas. & Sur. Co.*, 337 Mass. at 188–189, 148 N.E.2d 659.

The instant case presents a set of unique circumstances distinguishable from the circumstances in both *Acushnet* and *Powell*. In the instant case, unlike *Acushnet*, the insured had actual knowledge, in 1973, of a specific and sudden accident (*i.e.*, a 500–gallon underground tank leak of a toxic chemical) which, the insurers assert, placed the insured on notice of likely consequential property damage (*i.e.*, groundwater contamination). The present case is also distinguishable from *Powell*. In *Powell*, the insured knew of the injury giving rise to the liability when the incident occurred, but failed to notify his insurer at the time because of his erroneous but good faith belief that he could not be held liable for the injury. Unlike the injury in *Powell* which was obvious to all who observed the incident (including the insured), the property damage in the instant case was ascertainable in 1973 only through further reasonable inquiry by those who had actual knowledge of the tank leak: *i.e.*, the insured. The question thus arises: What is required of a policyholder who has actual knowledge of a 500–gallon underground tank leak of a toxic chemical and is, thus, put on notice of likely consequential prop-

---

**3.** In *Powell*, the claimant was injured when a substance called "flash powder," which a rock band at the insured's nightclub was using to create smoke, ignited, injuring the claimant.

erty damage as the result of this accident on its property?

The rule espoused in *Powell, i.e.,* that an insured's reasonable and good faith doubt as to the existence of any injury or liability cannot deprive the insurer of its contractual right to notice of a sudden accident of this magnitude reasonably likely to cause property damage, appears equally applicable to the facts of the instant case.

The policyholders assert that, because they had no *actual* knowledge, in 1973, of the groundwater contamination resulting from the tank leak, they had no duty to notify their insurers of the tank leak at that time. However, the policyholders' actual knowledge of the tank leak put them on notice, in 1973, of the property damage which might and did result from this tank leak. Any assertion by the policyholders that, in the circumstances of this case, they were not on notice of the likely consequential property damage resulting from a tank leak of this magnitude and, moreover, that they had no duty to make any further inquiry, although knowledgeable of and experienced in the characteristics of TCE, nullifies the policy underlying notification provisions and is contrary to common experience. The policyholders argue that, although 500–gallons of a noxious chemical, TCE, allegedly disappeared from an *underground* storage tank within a period of one to two days, they had no duty to make any further inquiry with respect to any consequential underground contamination or to notify their insurers of the tank leak because, at that time, they had no *actual* knowledge of the ensuing property damage. The weakness with the insured's argument is that, on the undisputed facts of this particular case, it was solely within the control of the insured to acquire such knowledge. The insured had *actual* knowledge of the tank leak when it occurred and was, therefore, put on notice of the likely consequences of the tank leak at that time, but failed to investigate to determine the extent of the property damage. Nevertheless, the policyholders argue that they had no duty to notify the insurer until, at the earliest, 1979 when they learned of the TCE contamination of the Town's wells,

approximately six years after the alleged tank leak. This argument, in itself, is specious since the policyholders did not even notify the insurers of the tank leak until 1986, approximately thirteen years after it occurred and approximately three years after the insured's general manager denied that any tank leak of TCE ever had occurred on the insured's property.

In the particular circumstances of this case, I rule that the policyholders, as of the time they acquired *actual* knowledge of the tank leak in 1973, were put on notice of the likely consequential property damage and, therefore, had a duty to notify their insurers of the tank leak at that time. Thus, since the insured's duty to notify their insurers of the occurrence arose in 1973, before the effective date of Mass. Gen.L. ch. 175, § 112, the insurers need only show untimely notice to preclude coverage. The insurers have made such a showing and, therefore, I conclude that the insureds have failed to provide timely notice under the terms of the policy. If the principle underlying the duty to notify is to have any significance at all, it certainly cannot mean that an insurer who has been notified of a sudden accident of this magnitude thirteen years after it occurred has been seasonably notified.

Moreover, even assuming that actual prejudice is required, I conclude that the insurers have shown actual prejudice as a result of the policyholders' failure to seasonably notify them of the occurrence. Notice provisions serve numerous purposes. Besides seeking to assure insurers of the opportunity to investigate occurrences and potential claims promptly while the facts remain fresh in the minds of the parties and witnesses, they are designed to alert insurers to the existence of occurrences before the assertion of any claims. Notice provisions seek to allow insurers to avoid the loss of information, to locate potential witnesses, to guard against fraud, to investigate the facts upon which the claim is based, and to prepare to satisfy or contest any resulting liability. Prompt notification also enables the insurer to take action to limit damages, risks, and expo-

sure for which the insured may claim indemnity.

The policyholders assert that the Supreme Judicial Court's decision in *Darcy v. Hartford Ins. Co.*, 407 Mass. 481, 554 N.E.2d 28 (1990) supports their position that the insurers have suffered no actual prejudice. However, the facts of *Darcy* are entirely distinguishable from the facts of this case. In *Darcy*, the Court concluded that the insurer had not carried its burden of proving that the delay in giving notice had materially prejudiced its interests. The Court based its conclusions on the findings of the trial judge that the insurer had made "no meaningful attempt to identify employees of [the insured], or to locate eyewitnesses to the accident," *Darcy, supra*, at 487, 554 N.E.2d 28, and that the insurer's "efforts boil[ed] down to a torpid effort at finding [the insured's] principal without any corresponding effort to investigate the incident itself." *Id.* In this case, unlike the *Darcy* case, the undisputed facts reveal that, upon notice of the alleged tank leak, the insurers attempted to investigate the incident by interviewing certain employees of the policyholders and attempted to locate potential eyewitnesses to the accident. The record reveals that the policyholders initially denied, in 1983, the occurrence of any tank leak on the property and did not notify the insurers of the tank leak until 1986.

Upon learning, in 1983, of the Town's 1981 lawsuit, the insurers proceeded to investigate the facts underlying the basis for the Town's claims. In December of 1983, Lumberman Mutual's claims investigator was told by the general manager of Valley Manufactured, who had been with Valley since 1969, that there was never any leakage from the tank that stored TCE. (Insurers' Consolidated Appendix, Vol. IV, Exh. J, pp. 4–5). Moreover, Lumberman was also told that there had never been any dumping of pollutants at Valley. Apparently, in 1985, the policyholders, for the first time, informed the EPA of the tank leak. In March of 1986, in response to interrogatories, the policyholders, for the first time, informed their insurers that the alleged TCE tank leak had taken place in 1973.[4] In 1986, the same general manager who had, in 1983, denied that there ever was a tank leak or pollutant dumping of any kind, stated that the tank leak took place in 1972 or 1973, that he had been informed of it the same day upon which it occurred and that he had observed the tank being lifted out of the ground for repair.

Moreover, upon investigation of the tank leak, the insurers learned that a Valley employee, who had observed relevant events, including most particularly, the events surrounding the alleged tank leak as they took place, had died in September of 1984. Another high-ranking Valley employee died in 1986. Thus, unlike *Darcy*, in which the insurers' contentions of lost evidence were purely speculative, the insurers in the present case have shown that they are in a substantially less favorable position to ascertain facts relating to the tank leak than they would have been had the insured provided timely notice of the occurrence.

It is also undisputed that, in 1981, the policyholders and Town representatives entered into discussions with respect to the contamination. At minimum, these discussions, whether or not they would have resulted in a full settlement of any liability, presented an opportunity for the insurers, had they been notified of the discussions, to ascertain, at an early stage of the dispute, the extent of the contamination as of 1981 and the Town's inclination to settle the matter in 1981. It is also undisputed that the policyholders refused the Town's 1981 request that the policyholders contribute to the cost of constructing two "interceptor" wells to intercept the contamination in an attempt to decrease or eliminate, further spread of contamination. The policyholders' failure to seasonably notify the insurers of either the 1973 tank leak, their actual knowledge of the contamination of the Town's wells in 1979, or the 1981 law-

---

**4.** It was not until Valley responded to interrogatories in 1986 that the companies finally disclosed to the insurers the TCE tank leak incident. (Con.App. IV:A:p. 25). This alleged "accidental leak" was reported to EPA on December 23, 1985. (Con.App. IV:G:p. 59).

suit by the Town deprived the insurers of the opportunity to consider this request at the time the Town made it and/or to reconsider it before further contamination occurred. Moreover, seasonable notification to the insurers would have provided the insurers with the opportunity to ascertain the extent of the EPA and the DEQE's interest and involvement in the dispute, if any, in 1981.

There is absolutely no rational explanation for the failure to report this sudden accidental tank leak to the insurers for approximately thirteen years,[5] especially the failure to report it after the closing of the Town's wells in 1979 and, more especially, the failure to report it immediately after suit was filed in 1981. A thirteen-year delay in reporting an accident of this magnitude is untimely and prejudicial for no other reason than that the crucial evidence relating to the accident itself, including whether it even occurred, is no longer available. *See Darcy v. Hartford Ins. Co.*, 407 Mass. 481, 487–488 n. 5, 554 N.E.2d 28 (stating that insurers' inability to ascertain facts with regard to the occurrence constitutes prejudice if this inability results from insured's failure to provide prompt notice). This is especially true on the facts of this case where, among other things, the insured had *actual* knowledge of the tank leak and, thus, was put on notice of likely property damage thirteen years before it ever notified its insurers of the occurrence of the accident, where the *physical* evidence of the tank leak (to determine if the tank contained TCE) is crucial to the insurers' interests, where an eyewitness to the tank leak has died during the interim, and where the insured initially told their insurers as late as 1983 that no tank leak of TCE had ever occurred. If thirteen years [6] does not constitute unreasonable notice and prejudicial delay in the circumstances of this case, then the concept of late notice is without meaning.

The insurers' motion for summary judgment on the ground of late notice is granted. Accordingly, the policyholders' motion for summary judgment on this ground is denied.

SO ORDERED.

---

5. It is argued that the only rational explanation for such a late delay in the giving of notice is that there was in fact no sudden accident in 1973. However, the Court is proceeding, for purposes of this motion, on the assumption that a specific accident did in fact occur in 1973.

6. I rule, moreover, that even a delay since 1979 constitutes unreasonable notice and prejudicial delay in the circumstances of this case for the same reasons outlined above.