White, J.
INTRODUCTION
Plaintiff Insco Corporation (“Insco”) brings this suit against its primary insurers, Travelers Indemnity Company (“Travelers") and Federal Insurance Company (“Federal”) for failing to defend suits against it for pollution-related injuries (hereinafter, “underlying claims”). Insco also alleges thatTravelers, Federal, and its umbrella insurer, Chicago Insurance Company (“Chicago”), have a duty to indemnify Insco in connection with the underlying claims. Finally, Insco includes claims under G.L.c. 93A against Travelers and Federal. All of the defendants have submitted cross motions for summary judgment on various issues.
BACKGROUND
A. The Insured and the Insurers
A manufacturer of gears and other precision machinery, Insco has operated a manufacturing plant in Groton, Massachusetts since 1960.
From 1976 to 1989, Insco used trichloroethane (“TCA’j, a solvent, to remove grease and oils from gears. Insco paid licensed haulers of hazardous materials to deliver the TCA in 55-gallon drums. After transferring the TCA into the degreaser through a pump or enclosed 5-gallon pail, Insco transferred the spent TCA back into the 55-gallon drums. The licensed haulers then removed the TCA from the premises.
The degreasing room where the TCA was both stored and used had no floor drains. Plumbing from the building led to a septic system and leaching field.
Insco is insured under the following policies: 1) two property and comprehensive general liability insurance policies issued by Travelers, effective from October 1, 1975, through March 31, 1977; 2) nine consecutive year-long property and comprehensive general liability insurance policies issued by Federal, effective from April 1, 1977, through April 1, 1989;[2] 3) two commercial umbrella liability insurance policies issued by Chicago, one effective from April 1, 1983, to April 1, 1984, and the second effective from April 1, 1984, to April 1, 1985. Both of Chicago’s umbrella policies are excess of $500,000 in primary coverage issued by Federal.
Travelers’ primary policy provides that it will defend and indemnify Insco for its liabilities for bodily injury or property damage caused by an occurrence. Federal’s policy provides that it will defend and indemnify Insco for its liabilities for bodily injury, property damage, or personal injury caused by an occurrence. *117 Chicago’s policy agrees to indemnify Insco for its liabilities for personal injury or property damage arising out of an occurrence, but contains no express duty to defend.
All of the named policies contain a pollution exclusion clause, defined more specifically in the body of this decision.
B. The Underlying Claims
On October 29, 1986, the Massachusetts Department of Environmental Quality Engineering, now the Department of Environmental Protection (“DEP”), issued a Notice of Responsibility (“NOR”) to the owner of a manufacturing facility neighboring Insco called FL Aerospace, later called Grimes Aerospace (“Grimes Aerospace”). The NOR charged Grimes Aerospace with responsibility for volatile organic compounds (“VOCs”) it had discovered on Grimes Aerospace’s property.
On January 27, 1988, the DEP issued a similar NOR to Insco, stating that an actual release of VOCs had occurred on Insco’s property and that Insco’s failure to take corrective actions could result in DEP action against Insco.[3] Insco responded by hiring the law firm of Sullivan & Worcester, which retained Clean Harbors Environmental Engineering, now Clean Harbors Environmental Services, Inc. (“Clean Harbors”). Clean Harbors undertook an extensive site investigation, including looking into the release of TCA on Insco’s property.[4]
By letter dated November 23, 1988, the Town of Groton (“Town”) asserted a claim, pursuant to 42 U.S.C. §9612(a), against Insco for costs incurred in connection with alleged groundwater contamination. Insco, by a February 8, 1989 letter, indicated that it would discuss remedial measures and undertake the contamination assessment as requested in the NOR. Insco, the Town, and F.L. Aerospace entered into a Standstill Agreement in May 1989. In November 1990, the Town reasserted its claims, threatening to file suit if not reimbursed for its costs.
In 1989, Insco was named as a defendant in three Middlesex Superior Court lawsuits brought by landowners neighboring the Insco site. Plaintiffs in Budd[5] and Lyons[6] alleged that Insco had released hazardous wastes during its operations and stated claims under G.L. 21E and for strict liability, negligence, trespass, and private nuisance. The plaintiffs in Coble[7] alleged that Insco “intentionally, wilfully, recklessly, criminally and negligently, and in violation of law, disposed of [hazardous substances] into the ground.” The Coble suit involved claims under G.L.c. 2 IE and for strict liability, negligence, trespass, private nuisance, and fraud.
C. Insco Notifies its Insurers
By a June 28, 1989 letter, Insco notified all of its insurers that it had been named as a defendant in the Budd and Lyons cases and that it had received an NOR from the DEP. On December 7, 1989, Insco notified all of its insurers that it had been named as a defendant in the Coble case. By letter dated December 12, 1990, Insco notified all of its insurers that the Town had asserted claims against it and that it was contemplating entering into a global settlement for the Budd, Lyons, and Coble lawsuits and the Town’s claims. Insco’s attorney wrote, “F.L. Aerospace has invited Insco to join with it in those settlements, and Insco intends to enter into such settlement negotiations. If a settlement is indeed forthcoming, it is likely to happen in the very near future. I will therefore hope to hear from each of you expeditiously.” In its letters, Insco requested that the insurers defend and indemnify it for the underlying claims.
In June 1991, Insco and Grimes Aerospace settled with the plaintiffs in Budd, Lyons, Coble, and with the Town, receiving releases in the process.
C. The Insurers’ Response 1. Federal
By a letter dated August 22, 1989, Federal denied coverage for the DEP, Budd, and Lyons claims without conducting further investigation into the situation.[8]
2. Travelers
By a letter dated December 21, 1990, Travelers offered to pay 5% of Insco’s defense costs in connection with the Coble case. By a letter dated December 27, 1990, Travelers denied coverage with respect to the Budd case. By letter dated January 11, 1993, Travelers denied coverage with respect to the Town’s claims, on the basis that the Town’s request for payment from Insco was not a “suit” within the meaning of its policies. By a letter dated January 22, 1991, Travelers indicated it would pay 5.5% of Insco’s defense costs in connection with the DEPs case, but denied coverage with respect to the Lyons case. Travelers denied coverage for the Budd and Lyons cases, it claimed, because the plaintiffs in both cases had acquired the allegedly contaminated properties after the effective date of the last Travelers policy.[9]
By letter dated June 16, 1994, Traveler's amended its offer to contribute to the defense of the Lyons and Budd suits on a pro rata basis.[10] Travelers’ other communications with Insco included (1) an October 2, 1989 letter requesting facts and documentation pertaining to Budd and Lyons;[11] (2) a December 21, 1990 letter requesting actual notification the Town’s claims; (3) a January 22, 1991 letter requesting Insco’s response to the DEP NOR issued on January 27, 1988; (4) a February 1, 1991 letter requesting information concerning Insco’s operation, Insco’s response to DEP’s NOR, information concerning property contamination, and additional information concerning the Town’s demand; and (5) an April 11, 1991 reiterated request for information concerning contamination. In a July 26, 1991 letter, plaintiffs counsel apologized for the “long delay” to the requests for information and promised to provide it. In the same letter, Insco ad *118 vised Travelers that the Coble action had been settled and that Insco had agreed to pay $100,000 toward the Town’s claims. In August 1991, Insco provided Travelers with the requested information concerning its operations and response to the DEP’s NOR. Travelers requested information relating to the settlement agreements in a letter dated October 10, 1991.
3. Chicago
Chicago made its first request for information on February 8, 1991.
Neither Federal, Travelers, nor Chicago inquired into the progress of the settlement negotiations, the terms under discussion, or the development of final settlement documents.
D. Aftermath
From 1987 through February 1995, Clean Harbors conducted numerous reviews, analyses, and investigations regarding the contamination of the Insco property. Clean Harbors was unable to conclude, however, exactly how the property became contaminated with TCA. It concluded only that one of two “hot spots” on the site was the likely result of a sudden and accidental release of TCA, and that the other was not inconsistent with such an event. Clean Harbors concluded in 1995 that the levels of contamination at the site did not pose significant risks to merit further action, thereby completing the G.L.c. 21E process.
ANALYSIS
A. Insco’s Obligations Under the Policies 1. Notice
The defendants first argue that the plaintiff breached notice provisions of the policies in failing to give them notice “as soon as practicable”[12] of events it asserts constitute claims or occurrences under the policies. The Travelers policies require that the insured give:
(a) . . . written notice ... as soon as practicable, including in the notice particulars sufficient to identify the Insured, and also reasonably obtainable information respecting the time, place and circumstances of the occurrence, the names and addresses of the injured and of available witnesses.
(b) The Insured shall immediately forward to The Travelers every demand, notice, summons, or other process received by [it] or [its] representative, if claim is made or suit is brought against the insured.
The policies of Federal and Chicago contain substantially the same language. An “occurrence” is defined substantially the same in the policies, as “an accident, including continuous or repeated exposure to conditions which result in bodily injury or property damage.”[13] “Property damage” is defined in all of the policies as “physical injury to or destruction of tangible property which occurs during the policy period . . .”
Where an insurer claims that the insured’s notification was untimely, the insurer carries the burden of proving that the delay was substantially prejudicial to its interests. Darcy v. Hartford Ins. Co. 407 Mass. 481, 485, 487 (1990); Johnson Controls, Inc. v. Bowes, 381 Mass. 278, 282 (1980). The insurer must identify “the precise manner in which its interests have suffered.” Darcy, supra, at 486-87. Suggesting a mere possibility of prejudice is not enough. Id. at 486. Moreover, although the length of the delay is a relevant factor in determining the insurer has proved actual prejudice, Darcy, supra, at 486 (“the longer the delay, the more likely that prejudice exists”), the insurer must also show other facts or circumstances which demonstrate actual harm. Id. at 487 (concluding no prejudice to insurer on basis of trial judge’s finding that insurer had “sufficient opportunity to investigate the circumstances surrounding the plaintiffs’ injuries” after receipt of unseasonable notice). See also Fireman’s Fund Ins. Co., 765 F.Supp. at 1128 (finding insurer demonstrated prejudice where, upon notice of probable claim, insurer investigated by interviewing employees of policyholders and attempted to locate potential eyewitnesses). See G.L.c. 175, §112, as amended by St. 1977, c. 437.
a. Testing Disruptions
The insurers first claim prejudice to their position in that the TCA evidence “all but vanished during the time that Insco withheld evidence from the insurers.” They point to Clean Harbors’ Kenneth Tarbell’s testimony that, before Insco notified its insurers of the claims against it, Clean Harbor pumped a dry well on Insco’s property in order to empty and draw samples from it. Those procedures, Tarbell stated, “markedly disturbed ground water movement in that area . . . [and] disrupted any means at that time of determining what ground water movement had been.” Even if the court were to find credible this testimony,[14] the defendants have not produced enough evidence indicating that they would have been any more successful at determining ground water movement and the origin and time of the contaminant release prior to said digging and testing. As the insurers produced nothing more than the argument and evidence cited above, this court finds that, at this stage in the proceedings, they have not met their burden of showing prejudice on this issue.
b. Settlements
The insurers also cite the May 1989 Standstill Agreement and release of Grimes Aerospace as impairing their subrogation rights. Insco, in turn, points to the insurers’ responses, varying from casual indifference to utter unresponsiveness, to their receipt of notice that Insco anticipated entering into global settlement.[15] Compare Fireman’s Fund, supra (finding prejudice to insurers where insured failed to notify insurers that it had entered into discussions with respect to contamination).
“[A]n insurer who refuses to defend a suit at all may not assert that the insured’s reasonable settlement *119 was unauthorized.” Chemical Applications Co., Inc. v. Home Indemnity Co., 425 F.Supp. 777, 779 (D.Mass. 1977), citing Burke Moore Co., Inc. v. Lumbermens Mut. Casualty Co., 345 Mass. 66 (1962). See also Surnafil, Inc. v. Peerless Ins. Co., 418 Mass. 295, 305 (1994); La Pointe v. Shelby Mut. Ins. Co., 361 Mass. 558, 564-65 (1972). This court finds that the plaintiffs generally prompt settlement efforts were reasonable in that they minimized its potentially expanding liability.[16] Evidence in the record shows that the insurers’ requests for any information upon notice of said settlement negotiations were, at best, tepid. Pending investigation into their liabilities under the policies, the insurers could have undertaken to defend the insured under a reservation of rights, a common procedure, without barring subsequent withdrawal in the event of a no-coverage determination. See Surnafil, 418 Mass. at 304; Salonen v. Paanenen, 320 Mass. 568, 573 (1947). It follows that the insurers should not be able to claim that the settlements prejudiced their interests.
c. Consultants’ Fees
Finally, the insurers claim that “Insco hired consultants of its choice, not the insurers!’] choice, and incurred thousands of dollars of charges.” Again, the insurers fail to show how the plaintiffs incurring these costs substantially prejudiced its case — i.e., that given earlier notice, the insurer would not have incurred similar consulting and testing fees.
In essence, whether there was prejudice to the insurer in not providing timely notice remains a genuine issue of material fact for trial. See Surnafil, Inc. v. Peerless Ins. Co., 34 Mass.App.Ct. 248, 254 (1993), aff'd, 418 Mass. 295 (1994). For the reasons discussed above, the defendants’ motion for summary judgment on the issue of late notice is DENIED.
2. Voluntary Payments
The defendants also contend that the plaintiffs obligations were incurred voluntarily and thereby excluded under the insurers’ policies. Federal and Travelers’ policy provisions contain essentially the same language: “The insured shall not, except at [its] own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.” Part of Chicago’s “Assistance and Cooperation” clause requires that “the insured shall make no settlement for any sum in excess of the retained limit without the approval of the company.” Citing the case of Augat, Inc. v. Liberty Mutual Ins. Co., 410 Mass. 117 (1991), the defendants argue that an insured who, without the knowledge or consent of its liability insurer, agrees to comply with the demands of the DEP “voluntarily assumes” that obligation for purposes of determining whether there has been a breach of the voluntary payment provision. Id. at 121. In that case, an electroplate manufacturing facility, without informing its insurer, entered into a consent judgment with the Commonwealth agreeing to decontaminate the site of its failed water treatment plant. Id. at 118-19. The Supreme Judicial Court considered and rejected the insured’s argument that its consent to judgment was not “voluntary” but instead coerced by the threat of a more costly verdict. Id. at 122.
We conclude that the decision was “voluntary” . . . because [the insured] had an alternative — it had the right to demand that [the insurer] defend the claim and assume the obligation to pay for the cleanup. Nevertheless, [the insured] failed to exercise this right. Thus, while [the insured’s] decision obviously was not “voluntary" in the sense of “spontaneous” or entirely free from outside influence, it was “voluntary” in the sense of “by an act of choice.” Therefore, we conclude that the voluntary payment clause, if applied literally, would remove the cleanup costs from the scope of coverage under the policy.
Id. The Augat court also rejected the insured’s argument that the insurer’s failure to introduce evidence demonstrating prejudice from the agreement to the consent judgment should preclude denial of coverage.[17] Id. at 122-23. Instead, the Court affirmed summary judgment in favor of the insurer, stating that the insured’s actions frustrated the fundamental purpose of the voluntary payment provision, i.e. the insurer was denied its right to protect its interests. Id. at 123. See also New England Extrusion, Inc. v. American Alliance Ins. Co., 874 F.Supp. 467, 470 (D.Mass. 1995).
This case differs from Augat, however, in that Insco did notify its insurers that it was contemplating entering into a global settlement on December 12, 1990.[18] None of the insurers took any affirmative action to protect their interests either by investigating the contamination or inquiring about the negotiations until Travelers’ stirrings on February 1, 1991. Chicago showed life on February 8, 1991, and Federal does not appear to have ever requested any information whatsoever. Certainly, silence by an insurer might reasonably be interpreted as a violation of the duty of good faith that the insurer owes its insured,[19] or it could also be interpreted as a disclaimer of coverage. Surnafil, 34 Mass.App. at 255.
An unjustified disclaimer of coverage or of the obligation to defend a lawsuit (or the functional equivalent of a lawsuit), see Hazen Paper v. United States Fid. & Guar. Co., 407 Mass. 689, 695-97 (1990), prevents an insurer from holding the insured thereafter to strict performance of the policy requirements, and the insured may later recover from the insurer not only defense costs but also, in some instances, the cost of any settlement entered into by the insured in good faith. See Berke Moore Co. v. Lumbermens Mut. Cas. Co., 345 Mass. 66, 70 (1962); Camp Dresser & McKee, Inc. v. Home Ins. Co., 30 Mass.App.Ct. [318,] 325-26 (1991).
*120 Surnafil, 34 Mass.App. at 255. See also Chemical Applications, supra, at 779; La Pointe v. Shelby Mut. Ins. Co., 361 Mass. 558, 564-65 (1972).
Although the parties, on the whole, agree on the dates and nature of the various communications between them, they disagree as to the factual inferences that should be drawn from those communications. If the insurers are found to have breached their own obligations under the insurance contracts, Insco might well be absolved of its alleged shortcomings with respect to the voluntary payment provisions. Cf. Surnajil, 34 Mass.App.Ct. at 254. At the least, there are material issues of fact relating to whether the insurers acted in good faith in determining the extent of their policy coverage and whether insurers had an adequate opportunity to protect their interests under the contracts — that is, whether the plaintiffs alleged breach of the voluntary payment provisions frustrated their purpose. As these and other issues require determination by the trier of fact, the insurers’ motions for summary judgment on breach of the voluntary payment provision is DENIED.
B. The Nature of the Coverage
As the fact-finder’s decision on the insured’s obligations under the policies may be dispositive of the parties’ remaining arguments, it is suggested that the case might well benefit from bifurcation, but this is a decision for the presiding judge in the session to which this case is assigned. For the purposes of this decision, the remaining issues raised in these motions, all of which concern substantive questions regarding the nature and effect of coverage under the provisions of the various policies, will be reserved to a later date, pending disposition of the factual questions discussed in this decision.
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendant insurers’ motion for summary judgment on the issue of late notice and on the issue of breach of the voluntary payment provision be DENIED.

 For purposes of this action, Insco seeks recovery from Federal with respect to the policies in existence from April 1, 1978 through April 1, 1986. Insco does not challenge Federal’s denial of coverage under the post-1986 policies.

 Evidence in the summary judgment record indicates that Insco began responding to the DEP’s environmental concerns as early as the summer of 1988.

 Notably, Insco retained the services of Clean Harbors prior to its receipt of the DEP’s NOR.

 Budd and others v. FL Aerospace and others, Civil Action No. 89-2352 (Middlesex Super. Ct. filed April 12, 1989).

 Cozzens-Lyons and others v. FL Aerospace and others, Civil Action No. 89-3196 (Middlesex Super. Ct. filed May 16, 1989).

 Coble and others v. FL Aerospace and others, Civil Action No. 89-2352 (Middlesex Super. Ct. filed Nov. 15, 1989).

 Federal’s letter denying coverage noted only, “Should you wish us to consider any additional information, please forward it to us as soon as possible.”

 See Hoppy’s Oil Serv., Inc. v. Insurance Co. of North America, 783 F.Supp. 1505 (D.Mass. 1992) (vitiating duty to defend where property acquired after expiration of coverage).

 Travelers increased its offer after the Supreme Judicial Court had rendered its decision in Trustees of Tufts Univ. v. Commercial Union Ins. Co., 415 Mass. 844 (1993), and Insco had renewed its request for coverage.

 In that letter, Travelers indicated that it intended to investigate the facts and circumstances of the matter in the future, stating, “In the meantime, if you have any facts or documentation you believe the Travelers should consider in its coverage analysis, please provide them to the writer.”

 The term “as soon as practicable” means within a reasonabletime. LaPointe v. Shelby Mut. Ins. Co., 361 Mass. 558, 565 (1972); Powell v. Fireman’s Fund, 26 Mass.App.Ct. 508, 513, rev. denied, 403 Mass. 1106 (1988). “What is a reasonable time is a question of fact, but where the basic facts are undisputed it becomes a question of law.” Fireman's Fund Ins. Co. v. Valley Manuf'd. Products Co., Inc., 765 F.Supp. 1121, 1123 (D. Mass. 1991), aff'd., 960 F.2d 143 (1st Cir. 1992).

 The policies of Travelers and Chicago also require that said accident be “neither expected nor intended from the standpoint of the Insured.”

 Affidavits submitted by the plaintiff call into question whether the sampling procedures substantially prejudiced the abiliiy of the insurers to determine the source and timing of the TCA release.

 Only after the settlements were executed in June 1991, did the Travelers request information concerning the settlements in an October 10, 1991 letter.

 Indeed, the insured was presented with a “catch-22" predicament, as it could either enter into settlement for the underlying claims without the blessing of its insurers, or delay settlement, thereby risking further migration of the TCA, a potential increase in claimants, and an onset of litigation.

 The Augat court did not eliminate the requirement that an insurance company show prejudice in order to disclaim coverage for breaches of notice or consent-to-settlement provisions. Id.

 Whether said notice amounted to a “demand that [the insurer] defend the claim and assume the obligation to pay for the clean-up,” as required by Augat, supra, at 122, is unclear.

 An insurer’s obligation is to deal with its insured with “candor and fairness,” Trempe v. Aetna Casualty & Surety Co., 20 Mass.App.Ct. 448, 455, rev. denied, 396 Mass. 1102 (1985), and to conduct a reasonable and timely investigation. See Surnafil, 34 Mass.App. at 255 n.7, citing Murach v. Massachusetts Bonding and Insurance Co., 339 Mass. 184, 187 (1959).